# Illinois Official Reports

## Supreme Court

---

**Beggs v. Board of Education of Murphysboro Community Unit School District No. 186, 2016 IL 120239**

---

| | |
|---|---|
| Caption in Supreme Court: | LYNNE BEGGS, Appellee, v. THE BOARD OF EDUCATION OF MURPHYSBORO COMMUNITY UNIT SCHOOL DISTRICT NO. 186 *et al.* (The Board of Education of Murphysboro Community Unit School District No. 186, Appellant). |
| Docket No. | 120236 |
| Filed | December 1, 2016 |
| Decision Under Review | Appeal from the Appellate Court for the Fifth District; heard in that court on appeal from the Circuit Court of Jackson County, the Hon. W. Charles Grace, Judge, presiding. |
| Judgment | Appellate court judgment affirmed; Board order reversed. |
| Counsel on Appeal | Ian P. Cooper, Merry Rhoades, D. Shane Jones, and Kameron W. Murphy, of Tueth, Keeney, Cooper, Mohan & Jackstadt, P.C., of Edwardsville, for appellant. |
| | Ralph H. Loewenstein, of Loewenstein & Smith, P.C., of Springfield, for appellee. |
| | Stanley B. Eisenhammer, Jessica A. Walker, and Mary A. Karagiannis, of Hodges, Loizzi, Eisenhammer, Rodick & Kohn LLP, of Arlington Heights, for *amici curiae* Illinois School Board Association *et al.* |

Justices               JUSTICE THOMAS delivered the judgment of the court, with opinion.

Chief Justice Karmeier and Justices Freeman, Kilbride, Garman, Burke, and Theis concurred in the judgment and opinion.

**OPINION**

¶ 1      Plaintiff, Lynne Beggs, a tenured teacher, was dismissed for cause from her employment by defendant, the Board of Education of Murphysboro Community Unit School District No. 186 (the Board). Plaintiff subsequently requested a hearing before a mutually selected hearing officer under section 24-12 of the Illinois School Code (Code or School Code) (105 ILCS 5/24-12 (West 2012)). Following a four-day hearing, the hearing officer issued findings of fact and recommended that plaintiff be reinstated to her position with back pay and benefits because the Board failed to prove by a preponderance of the evidence that she had violated a notice of remedial warning or that she had engaged in irremediable conduct that constituted grounds for dismissal. Thereafter, the Board, in a written order, dismissed plaintiff notwithstanding the findings of fact and recommendation of the hearing officer. Plaintiff filed a complaint in the circuit court of Jackson County seeking administrative review of her dismissal. The circuit court reversed the Board's decision and ordered plaintiff reinstated with back pay and benefits. The appellate court affirmed. 2015 IL App (5th) 150018. We allowed the Board's petition for leave to appeal. Ill. S. Ct. R. 315 (eff. Jan. 1, 2015).

¶ 2                                BACKGROUND

¶ 3      Plaintiff was a full-time tenured math teacher at Murphysboro High School, beginning her 18-year-long employment there during the 1993-94 school year. Plaintiff never received an unsatisfactory evaluation or one that rated her as needing improvement during that time. However, after the death of her father in the summer of 2011, plaintiff's mother's health began to deteriorate, resulting in frequent hospitalizations.[1] As a result of assisting with her mother's care, plaintiff was either absent from school or late in arriving for a considerable number of days during the 2011-12 school term.[2] The school administrators—including the principal, Vincent Turner, the assistant principal, Jeff Keener, and the superintendent, Christopher Grode—were aware of plaintiff's mother's declining health. Nonetheless, the administration became increasingly concerned over plaintiff's late arrivals, her failure to submit lesson plans

> [1]A few weeks after plaintiff's discharge by the Board on April 30, 2012, plaintiff's mother died.
>
> [2]According to the school district, as of February 21, 2012, plaintiff had arrived late at least 19 times during the course of the 2011-12 school year. She also took 36 sick leave days during that same period. According to the collective bargaining agreement (CBA) between the union and the school district, the work day for teachers begins at 8:15 a.m., even though first period classes do not start until the 8:30 a.m. bell rings. Under the School Code, "sick leave" includes "serious illness or death in the immediate family." 105 ILCS 5/24-6 (West 2012). Moreover, a teacher's parents are considered "immediate family" for purposes of sick leave. *Id.*

on some occasions when she was absent, and the generally slow progress of her first-hour geometry class.

¶ 4 On January 30, 2012, Principal Turner issued a "Letter of Concern" to plaintiff, detailing a number of matters that plaintiff needed to correct. Specifically, the letter requested plaintiff to remedy her propensity to arrive late for work and her failure to submit lesson plans for the days she is absent or to timely submit plans for those days.

¶ 5 Plaintiff arrived late the next two days after receiving the letter, *i.e.*, on February 1-2, 2012. Grode and Turner met with plaintiff on February 2 to discuss her late arrivals and her lesson plans. Grode told plaintiff that he knew she had again arrived late on that day and that he intended to recommend to the Board that it issue a "Notice of Remedial Warning." Also on February 2, Grode gave plaintiff a letter documenting the two late arrivals since the warning letter of January 30, 2012, and noted that a remedial warning notice was being drafted. The letter of February 2 concluded by cautioning as follows: "Any further late arrivals to work will result in discipline including suspension without pay and possible termination. Please understand we consider this a very serious situation, and we expect you will correct it immediately."

¶ 6 On February 8 and 10, 2012, plaintiff was again late to arrive at school. She met with school administrators on February 10, and she told them that she was late as a result of having to stay with and care for her mother the evening before. She was physically and mentally exhausted from the ordeal and had overslept. Plaintiff was suspended with pay from February 10, 2012, through February 21, 2012.

¶ 7 Superintendent Grode issued plaintiff a letter on February 15, 2012, memorializing the suspension and further noting that he was recommending that the Board issue a notice of remedial warning and suspend plaintiff without pay for a period of time. Grode's letter noted that he was taking the action because of plaintiff's continual tardiness, especially after the January 30, 2012, warning letter. Grode wrote, "When a teacher cannot arrive to school on time to instruct students, I cannot condone the action by the teacher."

¶ 8 Grode also wrote a six-page letter for the Board, dated February 21, 2012, that detailed plaintiff's late arrivals and recommended that the Board adopt a resolution authorizing the issuance of a notice of remedial warning. Grode also asserted in his letter to the Board that plaintiff's late arrivals and absences from the classroom were having a detrimental impact on plaintiff's first-hour students, as they were one chapter behind other geometry classes at the school.[3]

¶ 9 On February 21, 2012, the Board suspended plaintiff without pay for the period running from February 10, 2012, through February 21, 2012, effectively converting her prior suspension with pay to one without pay. The Board also adopted a resolution authorizing a notice of remedial warning, which was issued to the plaintiff the next day on February 22, 2012.

---

[3]Grode's letter to the Board also mentioned a concern about plaintiff's timely reporting of grades. The letter, however, did not mention any concerns Grode had about plaintiff's lesson plans. Nor did the letter mention anything about there ever being a problem with plaintiff not teaching her students while she was actually in the classroom.

¶ 10 The notice directed plaintiff to correct her "deficient and unsatisfactory" conduct, stemming from her absences and late arrivals, in the respects listed below:

"1. You were insubordinate when you failed to follow the written directive provided to you on January 30, 2012 *** [and] you arrived after the designated work day start time [on February 1, 2, 8, and 10].

2. You were insubordinate when you failed to follow [Grode's] verbal directive to you on February 2, 2012, [and] you arrived past the designated start time on both February 8, 2012, and February 10, 2012.

3. You have repeatedly violated section 4.3 of the [CBA] in that you have continually arrived late for your job.

4. You have engaged in unprofessional conduct by leaving your classroom unattended and/or unsupervised during instructional time. This is a direct result of your failure to report to work as required by the [CBA], as well as the directives of your supervisors.

5. You have engaged in unprofessional conduct of failing to use classroom and instructional time appropriately and effectively, resulting in misused or ineffective use of instructional time.[4]

6. You have engaged in unprofessional conduct by not timely reporting the grades of students assigned to your classroom.

7. You have engaged in unprofessional conduct by not preparing adequate lesson plans that will enable substitute teachers to provide adequate instruction for students during your absences."

¶ 11 The Board's notice stated that if any of the deficiencies listed above were "repeated any time in the next two years," it may result in plaintiff's dismissal.

¶ 12 Plaintiff returned to work on February 22 and 23, 2012, with no performance issues but then requested and was granted a leave of absence from her duties from February 27, 2012, through March 14, 2012, due to the continued failing health of her mother. Plaintiff was excused from her responsibilities to prepare and submit lesson plans during this extended leave.

¶ 13 Plaintiff voluntarily resumed her position and was present at school on March 19 and 20, 2012 (March 15 and 16 were school holidays). Because of her mother's health, plaintiff again took sick leave on March 21, 22, 23, and 26, 2012. She returned to work on March 27, 2012, but was immediately suspended from her teaching position. On April 23, 2012, the administration advised her that it intended to recommend to the Board that her employment be terminated.

¶ 14 On April 30, 2012, the Board adopted a resolution to dismiss and to authorize a notice of dismissal pursuant to the School Code, which would terminate plaintiff's employment and suspend her without pay pending a final disposition of the dismissal proceedings.

---

[4]There is no record support for the notion that plaintiff's failure to instruct her class on the days she was present and on time had ever been a problem. This deficiency is best understood, then, by placing it in the context of the administration's grievances about her absences from the classroom because of her late arrivals.

¶ 15    Plaintiff timely requested a hearing before an impartial hearing officer. The parties agreed upon Jules I. Crystal to conduct the hearing, which was held for four days in January 2013. The Board argued at the hearing that plaintiff should be terminated because she violated the remedial notice in the following ways: (1) she did not effectively teach her first-hour geometry class when she returned to work on March 19, 2012, (2) she arrived late for work on March 20, 2012, and (3) she failed to have lesson plans available on March 21 and 22, 2012, when she was absent.

¶ 16    Carolina Badiano, an aide hired by the school to translate for a Spanish-speaking student, testified at the January 2013 hearing about the events that occurred during the first-hour geometry class on March 19, 2012. Badiano stated that plaintiff had arrived early for class on that day and was looking and sifting through papers at her desk, which "continued until after the [8:30] bell rang for like ten or 15 minutes."[5] Badiano testified that she felt compelled to bring the incident to the attention of the administration because, during the time plaintiff was looking at papers, students were "just sitting or on the phone or someone was sleeping." Badiano acknowledged that after the first-hour bell, announcements begin, the pledge of allegiance is said, and teachers report attendance on the Teacherlogic computer system. Badiano further stated that during the 10- or 15-minute period in question, plaintiff was not answering questions from the students. However, when class did begin, plaintiff fielded questions from the class and retaught some material that they had not understood before moving on to a new section. Badiano also acknowledged that there was no confusion in the classroom the rest of the week about what should be covered.

¶ 17    Matt Morefield, a student in plaintiff's first-hour geometry class, was called to testify by the Board. Morefield opined that it was the substitute teachers who were ineffective in teaching the first-hour class, not plaintiff. According to Morefield, there was never any concern expressed about plaintiff's actual teaching; rather it was her absences that affected the students' ability to learn because the substitute teachers were not as effective at presenting the material in a way that could be understood. Furthermore, Morefield testified that there were no problems with lesson plans in plaintiff's first-hour class on March 21 and 22, 2012. Morefield explained that he delivered the lesson plans himself on March 21 to the substitute teacher, Mr. Sendek. In that regard, Morefield testified that he was on his way to class when Mr. Manwaring, another teacher at the school, called him aside to deliver plaintiff's lesson plans that she had sent in for Mr. Sendek that day. Morefield then delivered the plans to Mr. Sendek within a minute of the 8:30 bell.

¶ 18    Plaintiff testified that she arrived at school at 8:10 a.m. on March 19, 2012. She knew her first-hour class would be somewhere around chapter 10, a chapter she was very familiar with, having taught it twice a year for the past 16 years to her geometry classes. When she arrived at her classroom, she unlocked the door and sat down at a desk to review notes that Mr. Sendek had left on it. She finished reviewing them by 8:30, at which time announcements were heard and the pledge of allegiance was said. This took about seven to eight minutes. A student then came into the class late, and plaintiff had one new student she was not aware of. She took attendance, and by this time it was 8:40. By that point, the students had been telling her that they did not understand the material taught by Mr. Sendek. Plaintiff perused Sendek's notes

---

[5]On cross-examination, Badiano seemed to contradict herself by suggesting that the 10- or 15-minute period of nonteaching may have begun not at the 8:30 bell but after announcements.

again. She then answered questions and explained the theorems needed for the homework. Plaintiff denied that class began late and was emphatic that answering questions from students was in fact considered "teaching."

¶ 19       Plaintiff further testified that on the evening of March 19, 2012, she visited her mother in the hospital in Cape Girardeau, Missouri. Her mother had contracted pneumonia, and when plaintiff left the hospital to return home, she did not know if her mother would make it through the night. Plaintiff called Superintendent Grode in the morning before school on March 20 to explain the situation and to tell him that she was going to be in after 8:15 a.m. but that she did not want to call in sick. Grode told her he would excuse the late arrival and that she would not be disciplined for it. She then arrived at school before 8:30 a.m. and taught her classes—including her first-hour geometry class—without incident.

¶ 20       Plaintiff also testified that on the evening of March 20, 2012, she received a call that her mother had suffered heart failure. Plaintiff called in sick on the morning of March 21 around 7 a.m. and told Linda Homan, a fellow teacher at the school, that she would send her the lesson plans for her first-hour geometry class. The transmittal note from the computer shows that Homan received the plans at 8:30 a.m. On the evening of March 21, plaintiff called Keener, the assistant principal, and told him she would be on sick leave the rest of the week because of her mother's illness. Plaintiff also called Homan, who again agreed to receive an e-mail of plaintiff's lesson plans. The transmittal shows that those plans were received by Homan at 8:30 a.m. on March 22.

¶ 21       Linda Homan testified that she received plaintiff's lesson plans by 8:30 a.m. on both March 21 and 22, 2012. Homan immediately took the lesson plans to the substitute teacher herself or had someone else do it. It would have only taken 5 to 10 seconds to take them to the classroom. Homan did not lose any of her own instruction time in helping out, and the plans would have been with Mr. Sendek well before announcements were completed.

¶ 22       Joseph Sendek testified that he was the substitute teacher during the period in February and March 2012 when plaintiff was either suspended or on sick leave from her first-hour geometry class. Sendek recalled substituting on March 21 and 22, 2012, for the first-hour class but could not recall whether lesson plans were available on those dates. He also did not recall if Grode had asked him about the availability of lesson plans for those days. Sendek testified that he used a department syllabus to plan for the class when he was substituting for the long stretch in February and March when plaintiff was out because of sick leave or suspension. Sendek stated that there were times when lessons plans were late, but this could have been in February, and he did not remember the dates for sure. Sendek offered that lesson plans should arrive before class starts because the substitute needs time to prepare for class. Sendek did not testify as to how much time he would need to review a lesson plan before starting to teach the class.

¶ 23       Christopher Grode testified that he was superintendent of schools for the district. He noted that he met with Badiano and Sendek on March 22, 2012, to discuss plaintiff's conduct and took notes of his conversations. Grode's notes indicated that plaintiff's lesson plans were transmitted by computer at 8:30 a.m. on both March 21 and 22 and then had to be transported to Mr. Sendek at the classroom. Grode's notes from his interviews also showed that lesson plans arrived late to the classroom on March 21 and 22, 2012. Grode testified that he excused plaintiff's late arrival on March 20, 2012, but he did so because he would not have been able to get a substitute if plaintiff had gone ahead and taken a sick day.

¶ 24    In a 67-page written recommendation, hearing officer Crystal concluded that the Board failed to establish by a preponderance of the evidence that plaintiff had violated the notice of remedial warning or that she had engaged in irremediable conduct warranting dismissal. Accordingly, the hearing officer recommended that plaintiff be reinstated to her position at the high school with no loss of seniority and that she be compensated with full back pay and benefits.

¶ 25    As to the events of March 19, Crystal found that plaintiff credibly testified as to how the first minutes of class were used (that being announcements, the pledge of allegiance, and addressing student complaints that they did not understand the material that the substitute teacher had covered) and that, due to Badiano's lack of teaching experience generally and lack of math experience specifically, Badiano's description should have "given the District pause before it placed such strong reliance on her assessment of what did or did not take place in the classroom." Crystal found that the evidence did not show that plaintiff failed to use classroom time "appropriately and effectively" on March 19.

¶ 26    With respect to the events of March 20, 2012, the hearing officer found that plaintiff contacted Superintendent Grode early that morning to let him know that she would not be able to arrive at school by 8:15 a.m. because of her having had to deal with her mother's health issues. The administration then agreed to excuse the late arrival, and plaintiff was able to arrive at school by 8:30 a.m. that day and teach her class.[6]

¶ 27    As to the events of March 21 and 22, 2012, Crystal found that after learning of the gravity of her mother's current condition on the evening of March 20, plaintiff contacted the school to relate her mother's situation and to say that she would likely not be coming to work for the remainder of the week; plaintiff also contacted Homan to make an arrangements for e-mailing the lesson plans to Homan. Crystal noted that Homan confirmed that the lesson plans were received around 8:30 a.m. on March 21 and 22 at the school. Crystal found that while Sendek was a reliable witness at the hearing, Sendek could not remember whether lesson plans were available on March 21 and 22 or when they arrived in the classroom. Crystal conceded that plaintiff failed to fulfill her responsibility to the letter with respect to lesson plans on these days but concluded that lesson plans did in fact arrive and that the students were impacted minimally, if at all, by the timing of their arrival and that very serious parental health matters played a role in plaintiff's actions on these days. Crystal did not find plaintiff's conduct "to have been the type of serious breach of [the notice] such that it supported, or could form the basis of, the decision to terminate her."

¶ 28    Crystal found that during the short remediation period following the notice, plaintiff had no unexcused late arrivals and fulfilled her obligations regarding substitute lesson plans. Crystal noted that while the directives were reasonable, he did not find that the perceived violations were either willful or intentional on plaintiff's part. Crystal emphasized that plaintiff was not provided a "reasonable opportunity to correct the job performance deficiencies" and "the fact that the District permitted [plaintiff] to continue as a teacher yet perform her duties in what it viewed as an unacceptable manner for months before issuing its Notice does not privilege the District to compress the time period for potential remediation." Crystal noted that plaintiff's

_____

[6]The hearing officer at one point incorrectly recited that plaintiff was absent on March 20 and 21 instead of March 21 and 22. We find, as did the appellate court, that the mistake did not affect the quality of the hearing officer's report.

work history "point[s] to the very real possibility that the performance issues displayed by [plaintiff] during this period represent an anomaly in her teaching career" and, at a minimum, plaintiff "should have at least been given an opportunity to prove whether or not this is the case."

¶ 29 The Board reviewed hearing officer Crystal's findings of fact and recommendation. Under the authority of section 24-12(d) of the School Code (105 ILCS 5/24-12(d) (West 2012)), the Board supplemented Crystal's fact findings, modified them where in its opinion they were against the manifest weight of the evidence, and made a final decision on July 30, 2013, to dismiss plaintiff despite Crystal's recommendation to the contrary.

¶ 30 With respect to the events of March 20, 2012, the Board supplemented facts regarding plaintiff's morning phone call to Grode, noting that he testified that when plaintiff called to say that she would be late on that day, she did not want Grode to "hold it against [her]." Grode explained that he decided to excuse her tardiness because there was no substitute teacher in place and he was aware that plaintiff's first-period class was already behind in their coursework. The Board also supplemented plaintiff's testimony, noting that she requested a reprieve that day because although she had been told to call in sick on any day that she thought she would be in after 8:15 a.m., she testified: "I don't want to do [those] kinds of things to the District. I wanted to be there and I wanted to be there for my students."

¶ 31 Regarding the lesson plans of March 21 and 22, 2012, the Board discredited Homan's testimony, noting that it was "ambiguous and uncertain" as to the manner and timeliness of the substitute's procurement of the lesson plans. The Board supplemented the facts with testimony from Morefield, a student in the class who stated at the hearing that it was obvious no lesson plan was available because the substitute teacher would leave the classroom to consult with other teachers, and "some days [the substitute teacher] would come back with one [and] some days he wouldn't. And it was kind of obvious where he was getting them from."[7]

¶ 32 The Board also supplemented Crystal's facts with testimony from then-Board President Mike Austin, who testified at the hearing that plaintiff dismissed the remedial warning and wanted to "play by her own rules" to the detriment of the students. Then-Board Vice President Mike Cripps testified that plaintiff was dismissed because she did not comply with the directives of the remedial letter—that is, at the time of dismissal, the issues of timely reporting to work, inadequate or nonexistent lesson plans, and insubordination for failure to comply with these requests remained.

¶ 33 In the "Decision and Conclusion" section of the Board's decision, it found plaintiff's conduct did not follow the Board's directives and this provided sufficient cause for her dismissal. The Board found that plaintiff violated the notice of remedial warning in three ways: (1) by failing to timely report to work by 8:15 on March 20, 2012, (2) by failing to have lesson plans available to the substitute teachers, and (3) by failing to teach her students "from bell to bell" and therefore losing instruction time on March 19, 2012, as the "Board concludes there

---

[7]The testimony of Morefield given before the hearing officer and relied upon by the Board here relates to a different time period and not March 21 and 22, 2012, as the Board seemed to think. As to March 21 and 22, Morefield specifically testified that there were no problems with lesson plans on those days and that he himself delivered the plans within a minute of the 8:30 bell on March 21, 2012.

was at minimum a 15-minute delay between the start of student instruction (at 8:30 a.m.)" and the start of instruction.

¶ 34 The Board concluded that plaintiff's misconduct was detrimental to the District and to the best interests of the students, providing sufficient cause for her dismissal. Specifically, the Board found that plaintiff's call-in on March 20 was detrimental, as she placed her own needs ahead of her classroom by cornering Grode into either excusing the late arrival or having no teacher for the first-period class that day. The Board also found that plaintiff's failure to have lesson plans available for March 21 and 22 was detrimental, as the late arrival of lesson plans, even if only shortly after 8:30 a.m., means loss of instruction time. Finally, the Board found that plaintiff's failure to teach "bell to bell" on March 19 was a detrimental loss of instruction time of particular importance, as the first-hour class was one chapter behind plaintiff's sixth-hour geometry class. With respect to Badiano's observations, the Board found that "any competent adult, whether trained or not, can determine whether students are engaged in class." The Board also considered hearsay evidence in the form of Grode's notes of interviews with 17 students from the class, wherein 12 of the students reported a late start of instruction on March 19.

¶ 35 The Board concluded that plaintiff's last-minute call to Grode and her failure to have lesson plans available for the substitute was insubordination warranting dismissal and that her ongoing behavior showed that she did not and would not correct her behavior. The Board, agreeing with Crystal that plaintiff understood the directives of the notice, noted that plaintiff voluntarily chose to return to work that week, an indication that she was ready to perform her duties and comply with the administration's expectations. Contrary to Crystal's suggestion that plaintiff should have been provided a reasonable time to remediate with a "last chance understanding," the Board emphasized that plaintiff was, in fact, given an opportunity to correct her behavior. She was aware her conduct needed to be corrected "immediately upon receipt" of the notice, yet she proceeded to violate the directives each day following her return to work. The Board concluded that the best interests of the school required that plaintiff no longer serve as a teacher in the District and ordered plaintiff's dismissal.

¶ 36 On September 3, 2013, plaintiff filed a complaint for administrative review of the Board's decision in the circuit court of Jackson County pursuant to the Illinois Administrative Review Law (Act) (735 ILCS 5/3-101 et seq. (West 2012)). On October 8, 2013, the Board filed a motion to dismiss plaintiff's complaint under section 2-619 of the Code of Civil Procedure (735 ILCS 5/2-619(a) (West 2012)), on the grounds that plaintiff mailed the summons issued to the Board to an address other than the Board's address and directed the summons to an individual unaffiliated with the Board. Plaintiff's September 3, 2013, affidavit of last known addresses of defendants, which was attached to the summons, properly identified "Murphysboro Community Unit School District 186" as a defendant but failed to correctly name the president of the Board or the Board's current address.[8] Despite these irregularities, the summons with the complaint attached was correctly routed to and received by the Board on September 4, 2013. In its motion, the Board asserted that plaintiff's failure to serve it at its

_____

[8] According to plaintiff's response to the Board's motion to dismiss, plaintiff's affidavit inadvertently listed Bob Chambers, the school education president, as president of the Board of Education for purposes of service and inadvertently listed the address of the Murphysboro Community Unit School District No. 186 as a previous address for the administrative offices of the school district.

proper address and upon the designated president within 35 days following the Board's decision did not strictly comply with the procedural requirements of the Act; therefore, the complaint should be dismissed with prejudice.

¶ 37    On October 15, 2013, plaintiff filed a motion for leave to file an amended affidavit of last known addresses and requested an alias summons. The alias summons was issued on October 21, 2013, some 50 days after the complaint for administrative review was filed and 49 days after the Board received, despite the error, the original summons with the complaint attached. The Board again moved to dismiss on the same grounds, arguing that the alias summons did not remediate her failure to comply. The circuit court found that the Board's receipt of the original summons was within the requisite time period prescribed by the Act and plaintiff also had an alias summons issued with due diligence and served within 50 days. The court denied the Board's motion to dismiss.

¶ 38    The circuit court then turned to the issue of plaintiff's dismissal from her teaching duties by the Board. Noting that section 24-12(d)(9) of the School Code requires consideration of both the Board's decision and supplemental findings of fact as well as the hearing officer's findings of fact and recommendation in making its decision (105 ILCS 5/24-12(d)(9) (West 2012)), the circuit court concluded that on review deference is to be given to the hearing officer because of his statutorily required experience, impartiality, and the fact that the hearing officer is the only one bound to hear the evidence and evaluate the credibility of the witnesses (105 ILCS 5/24-12(d)(3) (West 2012)). Based on the evidence presented, the circuit court reversed the Board's decision, concluding that the findings used by the Board in dismissing plaintiff were arbitrary, unreasonable, and unrelated to service. The circuit court ordered plaintiff's reinstatement to her teaching position with back wages and benefits.

¶ 39    The appellate court affirmed the decision of the circuit court. 2015 IL App (5th) 150018, ¶ 49. In so doing, the appellate court first addressed the Board's motion to dismiss on the basis of the irregularity in failing to correctly name the Board's president and the Board's current address. The appellate court noted that failure to correctly name the Board president was not a proper ground for dismissal, as the Act expressly prohibits dismissal on that ground as long as the Board has been named (see 735 ILCS 5/3-107(a) (West 2012)). 2015 IL App (5th) 150018, ¶ 8. The appellate court then found that dismissal was not warranted based on the mistaken address under the circumstances because plaintiff demonstrated a good-faith effort to comply. *Id.* ¶ 9.

¶ 40    The appellate court next addressed the appropriate standard of review to be applied in teacher dismissal cases. It began by noting that 2011 amendments to the School Code changed the dismissal procedure for downstate tenured teachers so that it now resembles the statutory procedure in place for the Chicago area public schools (upstate procedures), which gives deference to the final decision-making authority of the school board (see 105 ILCS 5/34-85 (West 2012)). 2015 IL App (5th) 150018, ¶ 39. The appellate court further found, however, that while strong deference is afforded the board's decision under the upstate procedures, under section 24-12 of the Code, "procedural hurdles" exist for dismissing downstate teachers so that "a certain level of deference *** [must] remain with the hearing officer." *Id.* ¶ 43. The court then examined the evidence through a lens that deferred to the hearing officer's findings and ultimately determined that the Board's findings were not supported by the evidence, holding that "none of the stated violations found by the Board can pass muster under the

- 10 -

required standard for a teacher dismissal case; that is, the above referred-to findings used to dismiss the plaintiff from her position were arbitrary, unreasonable, and unrelated to service, because no logical nexus exists between plaintiff's fitness to perform as a teacher and the misconduct in question which led to her dismissal." *Id.* ¶ 48.

¶ 41     The Board filed a petition for leave to appeal with this court, which we allowed.

¶ 42                                    ANALYSIS
¶ 43                    I. *Whether Statutory Jurisdiction Was Invoked*
¶ 44     The Board argues before this court that plaintiff's deficiencies in the service of process procedure caused the circuit court to lack statutory jurisdiction to hear the case and, therefore, the lower courts erred in denying the Board's section 2-619 motion for involuntary dismissal of plaintiff's complaint. To support its argument, the Board relies upon *Ultsch v. Illinois Municipal Retirement Fund*, 226 Ill. 2d 169 (2007), *Mannheim School District No. 183 v. Teachers' Retirement System*, 2015 IL App (4th) 140531, and *Spicer, Inc. v. Regional Board of School Trustees*, 212 Ill. App. 3d 16 (1991). We note that our review of this issue is *de novo*. *Ultsch*, 226 Ill. 2d at 178.

¶ 45     The Illinois Constitution grants an appeal as a matter of right from all final judgments of the circuit court (Ill. Const. 1970, art. VI, § 6) but further provides that final administrative decisions are appealable only "as provided by law" (Ill. Const. 1970, art. VI, § 9). A circuit court's exercise of review over a final administrative decision is thus limited to the specific dictates of the Administrative Review Law. *Slepicka v. Illinois Department of Public Health*, 2014 IL 116927, ¶ 34. In other words, a court exercises special statutory jurisdiction when it reviews a final administrative decision, and such jurisdiction is limited to the language of the statute conferring it and the court has no powers from any other source. *Ultsch*, 226 Ill. 2d at 178. Thus, whether dismissal of plaintiff's complaint was proper "depends on whether plaintiff strictly complied with the requirements of the Administrative Review Law." *Id.* at 179.[9]

¶ 46     Section 3-102 of the Administrative Review Law provides that unless review is sought "within the time and in the manner" set forth in the Act, the parties to the proceeding before the administrative agency shall be barred from obtaining judicial review of the administrative decision. 735 ILCS 5/3-102 (West 2012). Section 3-103 of the Act requires that a plaintiff seeking administrative review file its complaint and issue summons "within 35 days from the date a copy of the decision sought to be reviewed was served upon the party affected by the decision." 735 ILCS 5/3-103 (West 2012). The Act further provides, however, that "[n]o action for administrative review shall be dismissed for lack of jurisdiction based upon the failure to name" the board president where the board itself has been named as a defendant. 735 ILCS 5/3-107(a) (West 2012). The Act also provides that the plaintiff "shall, by affidavit filed with the complaint, designate the last known address of each defendant upon whom service shall be made." 735 ILCS 5/3-105 (West 2012). Moreover, the Act states that the form of

_____

[9]We also note that section 24-16 of the School Code (105 ILCS 5/24-16 (West 2012)) specifically provides that the provisions of the Act "shall apply to and govern all proceedings instituted for the judicial review of final administrative decisions of *** dismissal for cause under Section 24-12 of this Article."

- 11 -

summons and "the issuance of alias summons shall be according to rules of the Supreme Court." *Id.*

¶ 47    There is no question in the present case that plaintiff filed her complaint for administrative review and issued summons within the 35-day window provided by the Act. Moreover, the Board concedes that plaintiff named the Board as a proper party. Thus, we find the cases relied upon by the Board to be distinguishable. In *Ultsch* and *Mannheim*, the wrong parties were named as defendants in the complaint (and additionally in *Mannheim*, a summons was not issued at all within the 35-day period), and in *Spicer*, the plaintiff failed to name the necessary parties as defendants and failed to timely file the complaint and issue summons.

¶ 48    In contrast, the Board in the present case contends that plaintiff directed the summons to an individual unaffiliated with the Board and mailed the summons to an address other than the Board's address. We do not find that these matters deprived the circuit court of jurisdiction under the particular circumstances of this case. The Board concedes that it was correctly named in the complaint as a party. Given that the Act specifically prohibits the dismissal of an action for failure to correctly name the Board president where the Board itself is named in the complaint, we do not find a lack of strict compliance in connection with incorrectly identifying the Board president in the summons. We also note that the address listed in the affidavit for the summons was the previous address of the Board. The summons itself was then correctly routed to the Board and received by it on September 4, 2013, which was within the 35-day period set forth in the statute for the issuance of summons.[10] The Board suffered no prejudice on account of the irregularity, and plaintiff's counsel sought leave to issue an alias summons shortly after he became aware of the incorrect address. Under these specific circumstances, we find that the appellate court did not err in finding that the circuit court had statutory jurisdiction to conduct administrative review of the Board's decision.

¶ 49                                  II. *Standard of Review*

¶ 50    We now consider the appropriate standard of review to be applied in this case to assess whether plaintiff's dismissal by the Board was proper. The proper standard of review in cases involving administrative review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law. *Cinkus v. Village of Stickney Municipal Officers Electoral Board*, 228 Ill. 2d 200, 210 (2008). An administrative agency's findings and conclusions on questions of fact are considered *prima facie* true and correct. 735 ILCS 5/3-110 (West 2012). As such, an agency's factual findings are not to be reweighed by a reviewing court and are to be reversed only if they are against the manifest weight of the evidence. *Exelon Corp. v. Department of Revenue*, 234 Ill. 2d 266, 272-73 (2009). Factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident. *Cinkus*, 228 Ill. 2d at 210. Questions of law are reviewed under a *de novo* standard, and mixed questions of law and fact are reviewed under the clearly erroneous standard. *Exelon Corp.*, 234 Ill. 2d at 272-73. A mixed question of fact and law examines the legal effect of a given set of facts. *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 391 (2001). Put another way, a mixed question asks whether the facts satisfy the statutory

---

[10]The Act provides that summons be issued within 35 days from the date the copy of the Board's decision was served upon plaintiff as the party affected by that decision. The record shows that plaintiff's counsel was served and received a copy of that decision on August 5, 2013.

- 12 -

standard or whether the rule of law as applied to the established facts is or is not violated. *Exelon Corp.*, 234 Ill. 2d at 273. An administrative decision is clearly erroneous " 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393, 395 (quoting and adopting the definition of "clearly erroneous" from *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)).

¶ 51    The Board argues that the appellate court applied the wrong standard of review when it departed from the well-settled principles noted above and instead gave deference to the findings of fact and recommendation of the hearing officer rather than to the Board's decision, even though the Board is now considered by statute as the entity that makes the final decision for purposes of administrative review. Plaintiff, on the other hand, tracks the appellate court's analysis and argues that while amendments to the School Code made the Board the final decision maker, other legislative changes, changes that differ from those set forth by statute for Chicago-area teachers, suggest that the hearing officer's fact finding plays the pivotal role upon administrative review. Plaintiff argues that it is the hearing officer's recommendation that should be given deference and this court should use the hearing officer's findings of fact to determine whether they are against the manifest weight of the evidence.

¶ 52    The issue raised by the parties concerning the appropriate standard of review involves construing the statutory framework and is a pure question of law that we review *de novo*. See, *e.g.*, *Exelon Corp.*, 234 Ill. 2d at 274. When construing a statute, this court's primary objective is to ascertain and give effect to the intent of the legislature. *Barragan v. Casco Design Corp.*, 216 Ill. 2d 435, 441 (2005). The best signal of legislative intent is the language used in the statute, which must be given its plain and ordinary meaning. *Gillespie Community Unit School District No. 7 v. Wight & Co.*, 2014 IL 115330, ¶ 31. Where the statutory language is clear and unambiguous, the court must give it effect without resort to other tools of interpretation. *Exelon Corp.*, 234 Ill. 2d at 275. It is never proper for a court to depart from the plain language by reading into the statute exceptions, limitations, or conditions that conflict with the clearly expressed legislative intent. *Id.*

¶ 53    Section 24-12(d) of the School Code provides that if a dismissal of a teacher in contractual continued service is sought for cause, the board must first approve a motion containing the specific charges by majority vote. 105 ILCS 5/24-12(d)(1) (West 2012). The tenured teacher then has a right to request a hearing before a mutually selected hearing officer. 105 ILCS 5/24-12(d)(1), (2) (West 2012). The hearing officer is required to meet certain training and experience requirements and must not be a resident of the school district. 105 ILCS 5/24-12(d)(3) (West 2012). The charges supporting dismissal of a tenured teacher must be proved by the Board at the hearing by a preponderance of the evidence. See, *e.g.*, *Board of Education of the City of Chicago v. State Board of Education*, 113 Ill. 2d 173, 194 (1986); *Department of Human Services v. Porter*, 396 Ill. App. 3d 701 (2009).

¶ 54    Section 24-12(d)(7) of the School Code provides that the hearing officer must "report to the school board findings of fact and a recommendation as to whether or not the teacher shall be dismissed for cause and shall give a copy of the *** findings of fact and recommendation to both the teacher and the school board." 105 ILCS 5/24-12(d)(7), (8) (West 2012). The hearing officer's findings of fact and recommendation is to include an indication as to whether the conduct at issue occurred, whether it was remediable, and whether the proposed dismissal

- 13 -

should be sustained. 105 ILCS 5/24-12(d)(8) (West 2012). The school board then has 45 days from the date it receives the hearing officer's recommendation to issue a written order as to whether the teacher must be retained or dismissed from its employ. *Id.*

¶ 55 Section 24-12(d)(8) of the School Code sets the parameters for a school board's written order of dismissal of a tenured teacher following a recommendation of a hearing officer and provides as follows:

"The school board's written order shall incorporate the hearing officer's findings of fact, except that the school board may modify or supplement the findings of fact if, in its opinion, the findings of fact are against the manifest weight of the evidence.

If the school board dismisses the teacher notwithstanding the hearing officer's findings of fact and recommendation, the school board shall make a conclusion in its written order, giving its reasons therefor, and such conclusion and reasons must be included in its written order. *** The decision of the school board is final, unless reviewed as provided in [section 24-12(d)(9) of the School Code]." *Id.*

¶ 56 Section 24-12(d)(9) of the School Code essentially provides that the Board's decision is final unless administrative review is sought in circuit court under the Act, and "[i]f the school board's decision to dismiss for cause is contrary to the hearing officer's recommendation, the court on review shall give consideration to the school board's decision and its supplemental findings of fact, if applicable, and the hearing officer's findings of fact and recommendation in making its decision." 105 ILCS 5/24-12(d)(9) (West 2012).

¶ 57 We believe that the plain statutory language of section 24-12 provides that the decision of the school board is the final decision for purposes of administrative review. As such, the attendant deference to the agency's final decision noted in the above-cited case law applies with equal force here. The legislature is presumed to know of the traditional standards governing administrative review, and if it had desired a different result, it would have made clear that the hearing officer's findings are entitled to deference. Instead the legislature reformed the School Code to eliminate the hearing officer as the final decision maker.

¶ 58 The appellate court decided to reject the normal deference that would be afforded to the Board as an entity making a final administrative decision and instead decided to give "a certain level of deference" to the hearing officer. 2015 IL App (5th) 150018, ¶ 43. The appellate court chose this course for several reasons. First, it believed this course "better reflects our legal tradition of giving deference to the impartial entity charged with hearing evidence and evaluating witness credibility," and the school board neither hears the evidence nor is it impartial. *Id.* Second, the appellate court observed that section 24-12 contains "procedural hurdles" that (1) require the board to incorporate the hearing officer's factual findings, (2) prohibit the board from departing from the hearing officer's findings unless they are against the manifest weight of the evidence, and (3) require a certain level of qualification on the part of the hearing officer. *Id.* And finally, the appellate court found that it was "unclear what weight the legislature intended a reviewing court to give a *** hearing officer's recommendation" because the legislature stated only that the reviewing court "give consideration" to the school board's decision and the hearing officer's findings of fact and recommendation when conducting its review. (Internal quotation marks omitted.) *Id.* ¶ 41.

¶ 59 We believe that the appellate court overstated each of these points in relying upon them to find that the Board was not entitled to the normal deference accorded a final agency decision

maker under the Act. It is certainly true that subsection 24-12(d)(8) of the School Code requires the Board to incorporate the hearing officer's findings of fact. However, that subsection specifically allows the Board to supplement or modify those findings if, in the Board's *opinion*, it believes they are against the manifest weight of the evidence. The appellate court largely ignored the "in its opinion" language of the statute, which clearly indicates the legislature's intent to vest the Board with discretion to depart from the hearing officer's findings.

¶ 60        This does not mean that the hearing officer does not play a strong role in the process. The hearing officer is the one who hears the evidence and makes the record for the Board's review. This explains the requirements in the statute designed to ensure that hearing officers are disinterested and highly qualified. The statute then sets forth a manifest weight of the evidence standard to steer the Board's review of those findings. This does not equate, however, with a requirement that a reviewing court give deference to the hearing officer's findings in such a case. See *Acorn Corrugated Box Co. v. Illinois Human Rights Comm'n*, 181 Ill. App. 3d 122, 136-40 (1989). Again, this is because the statute plainly vests the Board with final decision-making authority after the hearing officer's "recommendation" is reported to the Board.

¶ 61        Section 24-12(d)(9) also directs the reviewing court to "*give consideration* to the school board's decision and supplemental findings of fact, if applicable, and the hearing officer's findings of fact and recommendation." (Emphasis added.) 105 ILCS 5/24-12(d)(9) (West 2012). But the most natural and plain interpretation of this provision is that section 24-12(d)(9) simply reinforces the existing statutory and case law requirement that the court on administrative review should consider the entire record. See 735 ILCS 5/3-110 (West 2012); see also, *e.g.*, *Russell v. Department of Central Management Services*, 196 Ill. App. 3d 641, 644 (1990) (review of administrative decisions cover all questions of law and fact presented by the entire record before the court). It is well established that where an administrative agency is responsible for a decision, the agency is required to "consider" the findings of its hearing officer. *Highland Park Convalescent Center, Inc. v. Health Facilities Planning Board*, 217 Ill. App. 3d 1088, 1092 (1991). A court on review is also expected to consider the entire record, including consideration of the hearing officer's findings of fact that involve credibility determinations, but on administrative review the court still only reviews the agency's findings of fact under the manifest weight of the evidence standard, not the hearing officer's recommendation and factual findings. See *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136-40. This is the case even when the findings of fact depend on the credibility of the witnesses—and even if the hearing officer, rather than the board, observed those witnesses. See *id.*; *Caracci v. Edgar*, 160 Ill. App. 3d 892, 895-96 (1987); *Ramos v. Local Liquor Control Comm'n*, 67 Ill. App. 3d 340 (1978); see also *Abrahamson v. Illinois Department of Professional Regulation*, 153 Ill. 2d 76, 95-99 (1992) (well settled that agency members making the final decision need not be present when the evidence is taken so long as they review the record of the proceedings, and it is the agency's fact-finding decisions that are then reviewed under the manifest weight of the evidence standard). The same result obtains even where, similar to the present case, the statute governing the agency directs that it "adopt the hearing officer's findings of fact if they are not contrary to the manifest weight of the evidence." *Acorn Corrugated Box Co.*, 181 Ill. App. 3d at 136 (citing Ill. Rev. Stat. 1987, ch. 68, ¶ 8-107(E)(2)).

¶ 62    We also find the appellate court's assertion that the Board is a partisan entity (while the hearing officer alone is the impartial and disinterested entity) to be both incorrect and an improper basis for departing from the traditional standard of review of agency decisions. It is well settled that an administrative hearing "is not a partisan hearing with the agency on one side arrayed against an individual on the other." *Abrahamson*, 153 Ill. 2d at 94. Rather, it is an administrative investigation instituted for the purpose of ascertaining and making factual findings. *Fleming v. Illinois Commerce Comm'n*, 388 Ill. 138, 147 (1944). Moreover, board members comprising the agency decision maker are assumed to be people " 'of conscience and intellectual discipline, capable of judging a particular controversy fairly on the basis of its own circumstances.' " *Abrahamson*, 153 Ill. 2d at 95 (quoting *Scott v. Department of Commerce & Community Affairs*, 84 Ill. 2d 42, 55 (1981)).

¶ 63    Thus, we will review the Board's supplemental factual findings, as well as the factual findings of the hearing officer that were incorporated unmodified into the Board's decision, to determine whether those findings were against the manifest weight of the evidence. In discharge cases, the scope of review is generally a twofold process. See *Porter*, 396 Ill. App. 3d at 718. First, as we have just stated, we apply the manifest-weight standard to the factual determinations. Second, we must determine whether the findings of fact provide a sufficient basis for the agency's conclusion that cause for discharge does or does not exist. *Department of Mental Health & Developmental Disabilities v. Civil Service Comm'n*, 85 Ill. 2d 547, 551 (1981). A school board's determination of cause to discharge is not *prima facie* true and correct; it is instead subject to reversal where it is arbitrary, unreasonable, or unrelated to the requirements of service. See *Porter*, 396 Ill. App. 3d at 726. We apply the clearly erroneous standard of review to this mixed question of fact and law, *i.e.*, whether we are "left with the definite and firm conviction that a mistake has been committed" when applying the established facts to the applicable legal standard for discharge. (Internal quotation marks omitted.) See *AFM Messenger Service, Inc.*, 198 Ill. 2d at 393, 395.

¶ 64                III. *Whether the Board's Supplemental Factual Findings*
                        *Are Against the Manifest Weight of the Evidence*

¶ 65    Having concluded that traditional standards of review for administrative proceedings are applicable to the present case, we turn to the question of whether the Board's supplemental factual findings were against the manifest weight of the evidence. The Board determined that there were three violations of the remedial notice over a four-day period from March 19, 2012, through March 22, 2012, that supported cause for dismissal. Specifically, the Board determined plaintiff violated the warning notice in three respects: "(1) on March [20], she did not report for work by 8:15 a.m.; (2) on March 21 and 22, she did not have lesson plans available on these days, so that the substitute teacher could provide instruction to the students; and (3) on March 19 she was not prepared to and did not start teaching at 8:30 a.m. (from bell to bell)."

¶ 66    With respect to plaintiff's late arrival to work on March 20, we note that plaintiff called in that morning after spending the night with her gravely ill and apparently dying mother. She spoke to Superintendant Grode on the phone, and he expressly excused the late arrival. Plaintiff then arrived before 8:30 a.m. and taught her first-hour geometry class without incident. These are the undisputed facts. Given that Grode specifically excused the late arrival,

we find the Board's finding of fact regarding this incident to be against the manifest weight of the evidence, as there was no insubordination in obtaining an excused late arrival (of only a few minutes with arrival before the first class starts) in lieu of taking a full day of sick leave.

¶ 67 Regarding the lesson plans of March 21 and 22, we note that it is undisputed that plaintiff transmitted those plans to the school at 8:30 a.m. The notice of remedial warning does not indicate the time by which the school would have had to receive the plans to fulfill the obligation spelled out in the warning. The substitute teacher for those days could not recall when he received the plans but noted that he would have needed some time to review them, though he did not specify how much time that would be. The Board's own witness, Morefield, testified that he delivered the plans himself on March 21, 2012, and that they arrived around the time of the 8:30 bell. It was also undisputed that a few minutes of preliminary announcements are heard after 8:30 a.m. before any instruction time could take place. Homan also testified that she received plaintiff's lesson plans on those days at 8:30 a.m. and they would have been delivered within seconds to the substitute teacher in plaintiff's first-hour geometry classroom. Grode's own testimony also indicated that the plans were received at the school at 8:30 a.m. The Board did not place in its notice the time by which the plans must be received at the school—*e.g.*, by 8:15 a.m. when teachers are also expected to arrive at school. Given that the plans arrived to the school by the start of class, we can only conclude that the Board's finding that plaintiff "did not have lesson plans available on these days so that the substitute teacher could provide instruction to the students" was against the manifest weight of the evidence, as a conclusion opposite of the Board's is clearly evident.

¶ 68 We next consider the Board's finding that plaintiff violated the notice provision that she provide effective classroom instruction in that she failed to teach bell to bell on March 19. We begin by noting that, unlike the appellate court and the hearing officer, we fully credit Badiano's testimony that plaintiff did not teach for a stretch of time at the beginning of the first-hour geometry class that day. Thus, we would conclude that a finding that at least a technical violation of the remedial notice occurred on March 19 was not against the manifest weight of the evidence. We also note that the lower courts were only able to render a contrary conclusion by reweighing the evidence and failing to give deference to the Board's findings and failing to credit Badiano's testimony and the administrator's notes from the interviews of the students who were in the class. This was obviously error.

¶ 69 Nonetheless, we note that the Board's conclusion appears troubling when considered in the context of other undisputed evidence. In that regard, we note that the Board concluded that "at minimum a 15-minute delay from the start of student instruction at 8:30 a.m." occurred. But it was undisputed that much of the first 10 minutes of first-period classroom time is taken up by announcements, the pledge of allegiance, and recording student attendance. It was also undisputed that plaintiff arrived at school that day in a timely manner at 8:10 a.m. It was also undisputed that that there had never been any problem with plaintiff teaching her class when she was actually present and in the classroom. The Board's concerns in the remedial warning seem to be spawned from plaintiff's late arrivals and lack of lesson plans. Thus, it is puzzling why the requirement to use classroom time effectively was even included in the notice unless it was related entirely to plaintiff's late arrivals. Given that plaintiff was on time that day, the incident of "ineffective teaching" on March 19, especially coming after plaintiff's long absence from the classroom, seems to evaporate as a cause for dismissal. Additionally, there was evidence presented that students were on their cell phones and one student slept while

plaintiff sifted through papers. There was no evidence presented, however, that plaintiff herself was sleeping or on her cell phone. The Board never explained what it thought plaintiff was doing during the dead time in the classroom or what would motivate her to sift through papers rather than address the class. Nor did the Board indicate that such behavior on the part of plaintiff had ever been a problem before. On the other hand, the undisputed evidence shows that plaintiff was getting her bearings in the initial minutes of that first-hour class and was attempting to determine what had been covered by the substitute during plaintiff's near-monthlong absence. There was also no question but that the next day she was able to teach the class effectively from the start.

¶ 70                    IV. *Whether the Board's Decision to Discharge*
                              *Was Clearly Erroneous*

¶ 71       We have reviewed the entire record and have concluded that two of the three violations of the remedial notice found by the Board were not supported by the manifest weight of the evidence. The third violation, though technically supported by the evidence, seems to be an understandable and minor breach given plaintiff's long absence from the classroom and the difficulty the first-hour geometry class had generally in learning from the substitute teacher.

¶ 72       While the Board's frustration with plaintiff prior to the notice of remedial warning is understandable and well documented, it is unclear from the Board's decision whether it would have found cause for discharge based on the incident of March 19, 2012, alone. Only a clear and material breach of the warning notice that was causally related to plaintiff's past deficiencies would support her dismissal. We conclude, based on the undisputed circumstances noted above, that this single incident was not a clear and material breach of the warning notice. Thus, the Board's decision to discharge plaintiff was arbitrary, unreasonable, and unrelated to the requirements of service, and we are left with a definite and firm conviction that a mistake has been committed.

¶ 73                                CONCLUSION

¶ 74       For the foregoing reasons, we hold that the Board's decision to discharge plaintiff was clearly erroneous. Accordingly, we affirm the appellate court's decision and reverse the decision of the Board.

¶ 75       Appellate court judgment affirmed; Board order reversed.