2022 IL App (1st) 200736-U

No. 1-20-0736

Second Division
July 19, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

|  |  |  |
|---|---|---|
| ALEX HALL, JR., | ) ) ) | Appeal from the Circuit Court of Cook County. |
| Plaintiff-Appellant and Cross-Appellee, | ) ) ) | |
| v. | ) ) | |
| STATE OF ILLINOIS CIVIL SERVICE COMMISSION, | ) ) ) | No. 19 L 50427 |
| Defendant-Appellee and Cross-Appellee, | ) ) ) | |
| and | ) ) | |
| STATE OF ILLINOIS DEPARTMENT OF CORRECTIONS, | ) ) ) | Honorable Neil H. Cohen |
| Defendant-Appellee and Cross-Appellant. | ) ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Justices Howse and Lavin concurred in the judgment.

**ORDER**

¶ 1    *Held*: The decision of the Illinois Civil Service Commission suspending plaintiff-appellant from employment is affirmed where the record supported the Commission's determination that he intentionally evaded a drug test by staging a medical incident. Plaintiff-appellant is also not entitled to attorney fees where he did not invalidate any administrative rule.

¶ 2    On June 20, 2019, the Illinois Civil Service Commission (Commission) issued a decision suspending plaintiff-appellant/cross-appellee Alex Hall, Jr. from employment with the Illinois Department of Corrections (IDOC). Specifically, the Commission found that Hall engaged in conduct unbecoming of an employee in that he intentionally evaded a reasonable suspicion drug test by staging a fainting incident at the time he was to provide a urine sample. Hall sought administrative review, and the circuit court affirmed the Commission's decision. Hall now appeals, challenging the Commission's finding that he intentionally evaded the drug test and seeking, among other relief, an award of attorney fees. IDOC has filed a cross-appeal, arguing that the Commission erred in finding that Hall could not be terminated from employment because the drug test was not supported by a reasonable suspicion. For the following reasons, we affirm the Commission's decision in its entirety.

¶ 3                                          I. BACKGROUND

¶ 4    Hall, a Senior Parole Officer for IDOC, was involved in a single-car accident on the night of October 25, 2017. He was arrested and cited for DUI and other traffic violations. On October 31, 2017, IDOC officials attempted to perform a reasonable suspicion drug test, but were unsuccessful in obtaining a sample from Hall. Subsequently, after an employee review hearing in

December 2017, Hall was terminated from employment with IDOC for refusing to submit to the drug test.

¶ 5     Hall appealed his termination to the Commission. The following facts were adduced at a hearing before Administrative Law Judge (ALJ) Daniel Stralka.

¶ 6     Hall testified that he was diagnosed with Type 2 diabetes in 2015. As such, he had to eat three big meals and three smaller meals throughout the day or else he would become "agitated, fatigue[d], disoriented, [and] very weak." He also took medication to control his blood sugar.

¶ 7     On the day of his accident, Hall worked his usual shift from 5:30 a.m. to 2 p.m. Later, he attended a union meeting in Chicago from 6-8:30 p.m. After the meeting, he went to a bar and drank a beer and a shot of tequila. He left the bar around 10:30 p.m. On the way home, he decided to pull off the highway to go to a fast food restaurant. According to Hall, he "fell asleep" while exiting the highway and rolled his vehicle off the exit ramp and into a ditch.

¶ 8     Illinois State Police Troopers Jeremy Kunken and Ben Bridell responded to the scene of the accident. Bridell controlled traffic while Kunken investigated the crash. Hall was able to climb out of his vehicle and speak to Kunken. Kunken smelled alcohol on Hall's breath and noticed his eyes were "red and glassy." Hall admitted to drinking the beer and shot of tequila. Kunken instructed Hall to perform a field sobriety test, which Hall failed. Hall was arrested for DUI after also refusing to submit to a breathalyzer. Subsequent breath testing at the police station showed Hall's blood alcohol content to be over the legal limit.

¶ 9     Because of the arrest, Bridell searched Hall's vehicle as part of a tow inventory. As relevant here, Bridell found a small plastic bag containing a residual amount of a "green leafy substance." He explained that there were "very few remnants of whatever had been in the bag," not enough to fill a shot glass. Bridell testified that he "assumed" the residue was marijuana based on the bag's

"strong odor of raw cannabis," but the contents were never tested because there was an insufficient amount to test. In fact, Bridell did not document the bag in any report because he thought it was "basically nothing of value." However, Bridell later mentioned the bag to Kunken along with the other items found in Hall's vehicle. Hall was not charged with any drug offenses, and neither Kunken nor Bridell testified that they suspected Hall was under the influence of marijuana. For his part, Hall testified that there was never such a bag in his vehicle, though he did also explain that his teenage son smoked marijuana and sometimes borrowed the vehicle. Hall did not have any conversations with his son about the alleged bag.

¶ 10    Hall reported his arrest to IDOC on October 28, 2017. Deputy Chief of Parole Thomas Hilliard learned of the report and called Chief of Parole Jason Garnett to inform him of it. Garnett then instructed Chief Investigator Mark Delia to follow up with the police about the legality of a firearm found in Hall's vehicle.[1] When Delia reported back to Garnett, he also mentioned that, in Garnett's words, the police found "some amount of marijuana" in Hall's vehicle, though Garnett admittedly did not know how much. According to Garnett, Delia told him that he had spoken to a "commander" with the Illinois State Police, but Garnett did not know the person's name or if they had been on the scene. Garnett did not take any further steps to clarify or verify the details of Hall's arrest.

¶ 11    Even so, Garnett concluded that the information from Delia was sufficient to warrant a reasonable suspicion drug test. Garnett arranged for the test to occur on October 31, 2017. On that day, Senior Parole Officer Daphnee Bills picked Hall up at his home and dropped him off at IDOC's Oakley parole office for a training session that was to begin at 8 a.m. Hall testified that he

---

[1] Further investigation revealed that Hall was legally carrying the firearm, and he was not charged with anything relating to the weapon.

did not eat breakfast that morning because he did not want to miss his ride to work and thought he would be able to get a snack during one of the usual breaks in training. However, Hall was summoned by his supervisor before the training began and told that he needed to report to the Chatham parole office.

¶ 12     At the Chatham office, Hall was informed of the drug test by Senior Parole Officer Quincy Shelby, who had been designated as Hall's required union representative.[2] Public Safety Drug Screening Specialist Curtis Marshall then read Hall the drug testing policy and procedures in the presence of Hilliard and Shelby. Shelby protested on the grounds that IDOC had not specified the basis for the reasonable suspicion underlying the test. However, Hilliard and Marshall proceeded with the test without offering an explanation. After being read the policy and procedures, Hall stated that he was not ready to provide a urine sample because he had just used the restroom at the Oakley office.

¶ 13     In accordance with IDOC policy, Hall was given eight ounces of water every half hour to facilitate the process. At some point after the second glass of water, Hilliard noticed that Hall's eyes were closed and asked him if he was asleep. Hall explained that he was diabetic, had not eaten, and felt "a little lightheaded." Marshall allowed Hall to eat some of the food he had brought with him. According to Hilliard, Hall ate a breath mint and "two or three [potato] chips." Hall

---

[2] The testimony showed that Shelby was told to serve as the union representative by Toriano Pulphus, who had been contacted about the test by Hilliard. However, there was some dispute about whether Pulphus had the authority to designate a union representative. According to Hilliard and Shelby, Pulphus was then the vice president-elect of the union and therefore had the authority to designate a representative because the union president was suspended at that time. On the other hand, Bills, Senior Parole Officer Natasha Dillard, and Parole Commander Dana Travis all testified that Pulphus lacked the authority to designate a representative. In fact, Travis testified that he (Travis) was then the vice president and therefore was the one who needed to be notified of any drug test. In any event, no issue of union representation has been raised on appeal.

testified that he ate a breath mint and "bit into a chip" but did not eat any more of the chips because his "mouth would have been dry."

¶ 14    Eventually, Hall indicated that he was ready to provide a urine sample after his third glass of water. He and Marshall went into a nearby restroom and went over the testing procedures. According to Marshall, Hall then took the sample cup and reached into his pants, but suddenly "listed backwards," hitting the wall and urinating on himself. Marshall grabbed Hall to control his fall and yelled out that there was a medical emergency. Hilliard ordered someone to call 9-1-1 and rushed into the restroom. Around that time, Bills came upon the scene and also entered the restroom to attend to Hall. In his testimony, Hall explained that he "blacked out" as he started to urinate and awoke on the restroom floor with Marshall and Bills standing over him.

¶ 15    Bills announced that Hall was diabetic and went to get him some sugar. She returned with a can of soda, a sucker, and a Tootsie Roll. Bills testified that she was unable to get anything in Hall's mouth, as the soda "just dribbled all over his clothes" and the Tootsie Roll simply fell to the floor. In contrast, Hilliard and Marshall testified that Hall was able to "sip" the soda. Marshall also testified that, as Bills gave Hall the Tootsie Roll, he (Marshall) advised against it because it might be a choking risk. According to Marshall, Hall then immediately "exhaled with cheek puffs" and blew the Tootsie Roll into his own lap. Marshall found this "odd" given Hall's previous unresponsiveness, which led him to believe that Hall was faking the episode. Bills, Marshall, and Hilliard all testified that Hall was mumbling something throughout this time in the restroom, but was unintelligible.

¶ 16    Paramedics arrived and transported Hall to the University of Chicago Hospital. When Hilliard called Garnett to provide an update, Garnett instructed Hilliard and Marshall to follow the ambulance to the hospital. Garnett then apprised Parole Commander Dana Travis of the situation

and told him that he needed to send a union representative to the hospital. Travis assigned Senior Parole Officer Natasha Dillard as that representative. Finally, Garnett testified that in a subsequent phone call, he instructed Hilliard to ask Hall to provide a urine sample and, if Hall could not, to request that he submit to a blood draw.

¶ 17 Hilliard, Marshall, Bills, and Dillard all met at the hospital and waited as doctors tended to Hall in the emergency room. Once the doctors gave permission for them to see Hall, Hilliard asked Hall if he was able to provide a urine sample. In their testimony, Bills, Dillard, and Hall added that Hilliard had to ask three times because Hall did not initially respond. Hall explained that he tried to answer the first time but "couldn't get [his] words out." After Hilliard asked for the third time, Hall responded that he could not provide a urine sample because he had just urinated on himself.

¶ 18 There was again conflicting testimony about what happened next. Hilliard and Marshall testified that Hilliard then asked Hall to submit to a blood test, which Hall said he would not do. According to Hilliard and Marshall, Hilliard then left the hospital after confirming that both Marshall and Dillard had heard the refusal. Hilliard also testified that he reported back to Garnett that Hall had refused to provide a blood sample, which Garnett corroborated in his testimony. On the other hand, Bills, Dillard, and Hall specifically testified that Hilliard did not ask Hall to submit to a blood test. Instead, Bills and Dillard testified that Hilliard left immediately after Hall stated that he could not provide a urine sample. Dillard further testified that she reported the lack of a blood draw request to Travis, though Travis was not specifically asked to corroborate this information during his testimony.

¶ 19 On June 7, 2019, ALJ Stralka issued a written proposal that the Commission uphold Hall's termination. Therein, ALJ Stralka acknowledged that the timing of Hall's fainting incident was

"highly suspect," but ultimately stated that there was insufficient direct evidence to conclude that he staged the incident or intentionally urinated on himself.

¶ 20    However, ALJ Stralka also found that Hall was requested but failed to provide either an adequate urine or blood sample. ALJ Stralka concluded that this failure must be deemed a "refusal" to take the drug test under the circumstances, which is tantamount to a positive result under IDOC policy. Additionally, ALJ Stralka noted that Hall did not submit any medical evidence to explain his failure to provide a sample, *i.e.*, "connecting his losing consciousness and urinating in his pants to his diabetic condition."

¶ 21    Lastly, ALJ Stralka determined that IDOC established a reasonable suspicion for the drug test because, although the specific official was not identified, the record showed that a "credible source," namely Illinois State Police, informed IDOC that suspected marijuana residue was found in Hall's vehicle.

¶ 22    On June 20, 2019, the Commission issued its final decision partially adopting and partially reversing ALJ's Stralka's proposal. Specifically, the Commission reversed ALJ Stralka's finding that IDOC had a reasonable suspicion to subject Hall to a drug test. In so concluding, the Commission reasoned that "all that was established was that a bag that may have once held marijuana was found in the console of [Hall's] vehicle, a vehicle that was shared with his teenaged son." The Commission also stated that, while the Illinois State Police would be considered a "reliable source" as a general matter, the fact that Garnett was apparently misled about the nature of the bag based on Delia's report of a conversation with an unknown official meant that it was "likely that the information conveyed to [IDOC] was inaccurate." The Commission further found Hall did not receive proper notification of the drug test because, contrary to IDOC's policy, no IDOC official provided Hall with an explanation of the reasons for the test. Based on these

findings, the Commission concluded that Hall could not be terminated from employment because he did not fail a legitimate drug test.

¶ 23     However, the Commission went on to find that there was sufficient evidence that Hall staged his fainting incident, citing (1) the "highly suspect" timing, (2) Hall's testimony that nothing like that had ever occurred before, and (3) the lack of any medical evidence linking the incident to Hall's diabetes. Consequently, the Commission determined that Hall had violated IDOC's Rules of Conduct in that his actions were unbecoming of an IDOC employee.

¶ 24     In fashioning a penalty, the Commission acknowledged that Hall's infraction must be balanced with other factors, such as his many years of continual service with positive performance reviews and minimal prior disciple. Ultimately, the Commission imposed a suspension of 60 days plus the duration of his suspension pending discharge, for a total of 90 days.

¶ 25     Hall filed a complaint for administrative review in the circuit court, challenging his suspension and the Commission's finding that he faked the fainting incident to evade the drug test. Hall also argued that he did not receive certain back pay and benefits that IDOC was required to pay under the Commission's order. Finally, Hall sought attorney fees under section 10-55 (c) of the Illinois Administrative Procedure Act (5 ILCS 100/10-55(c) (West 2018)).

¶ 26     On May 4, 2020, the circuit issued an order affirming the Commission's decision in all respects. Specifically, the court found that there was competent evidence in the record to a support a finding that Hall intentionally staged the fainting incident. Because it found no basis to reverse the Commission's decision, the court also determined that Hall's arguments in favor of backpay and attorney fees were moot. Additionally, the court declined to consider IDOC's arguments in favor of terminating Hall's employment because IDOC had not filed a separate complaint or counter-complaint for administrative review.

¶ 27    Hall filed his notice of appeal on June 2, 2020. IDOC also filed a notice of cross-appeal on June 10, 2020.

¶ 28                                    II. ANALYSIS

¶ 29    On appeal, Hall primarily argues that the evidence produced before ALJ Stralka did not support the Commission's determination that he feigned the medical emergency to evade the drug test. Consequently, Hall contends that this court should reverse his suspension and award him the back pay and benefits to which he would have been entitled had he never been suspended. Hall also seeks attorney fees under section 10-55 (c) of the Administrative Procedure Act based on IDOC's failure to properly notify him of the reasons for the drug test.

¶ 30    In its cross-appeal, IDOC argues that the Commission erred in determining that the drug test was not supported by a reasonable suspicion. Thus, IDOC maintains that the test was valid, and that termination is therefore the only possible sanction in light of Hall's refusal to complete the test.

¶ 31    In cases of administrative review, this court reviews the decision of the agency, not the circuit court. *Doe Three v. Department of Public Health*, 2017 IL App (1st) 162548, ¶ 25. The standard of review depends on the type of question presented. *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50. An administrative agency's findings of fact are considered *prima facie* true and correct and will be reversed on appeal only if they are against the manifest weight of the evidence. *Id.* A factual finding is against the manifest weight of the evidence only if the opposite conclusion is "clearly evident." *Id.* We review pure questions of law *de novo*, meaning we give no deference to the agency's determination. *Id.* If an appeal presents a mixed question of law and fact, then we employ the "clearly erroneous"

standard. *Id.* In this context, a determination is clearly erroneous where the reviewing court is " 'left with the definite and firm conviction that a mistake has been committed.' " *AFM Messenger Service, Inc. v. Department of Employment Security*, 198 Ill. 2d 380, 393 (2001) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 396 (1948)).

¶ 32                              A. Whether the Fainting Incident was Staged

¶ 33    We first address Hall's argument that the evidence did not support a finding that he staged the fainting incident in the Chatham restroom. According to Hall, the "uncontroverted" evidence produced before ALJ Stralka showed the incident was a genuine medical emergency. In particular, Hall cites the testimony that (1) he was a diabetic who had not eaten that morning, (2) he was unresponsive and delirious, and (3) he was transported to the hospital and received medical attention. Hall also asserts that he never refused to provide a sample, and that he had nothing to gain from evading the test because, even if he had smoked marijuana on the day of his car accident, it would have still been detectable for weeks after his fainting incident.

¶ 34    Frankly, none of Hall's points do anything to undermine the Commission's factual determination. Although Hall's diabetes and lack of food might be one plausible explanation of the events on the day of the drug test, they are hardly conclusive as to whether his fainting was legitimate. Nothing about Hall's behavior that day was necessarily inconsistent with what one would expect had Hall faked the incident. Indeed, Marshall, who was perhaps the most impartial witness to Hall's behavior, testified that he believed Hall to be faking.  Additionally, to quote the Commission's decision, the timing of the incident was certainly "highly suspect," to put it mildly. It simply strains credulity to believe that Hall would faint at the final moment before the time to provide a urine sample, all while ruining the chance to provide another sample in short order by

urinating on himself. Thus, we find that the Commission's determination that Hall staged the incident and intentionally urinated on himself was not against the manifest weight of the evidence.

¶ 35                    B. Whether Hall is Entitled to Backpay, Benefits, or Attorney Fees

¶ 36    As previously noted, Hall seeks relief in the form of (1) the backpay and benefits he would have received had he not been suspended and (2) attorney fees under section 10-55 (c) of the Administrative Procedure Act.

¶ 37    First, Hall's assertion of entitlement to the backpay and benefits is founded on the premise that his suspension should be reversed because he did not intentionally stage the fainting incident to avoid the drug test. However, because we have determined that the Commission did not err in finding that Hall staged the incident, there is no basis to reverse his suspension or award him the backpay and benefits he would have otherwise received.

¶ 38    Second, Hall argues that he his entitled to attorney fees based on the Commission's finding that IDOC did not follow its own drug testing policy in conducting the test. Specifically, Hall relies on the Commission's finding that IDOC failed to provide him with an adequate explanation of the alleged reasonable suspicion upon which the test was based.

¶ 39    While IDOC apparently concedes the policy violation, it does not follow that Hall is entitled to attorney fees. Illinois courts follow the "American rule," meaning that a victorious party normally cannot recover attorney fees from the losing party absent an express statutory or contractual provision. *Sandholm v. Kuecker*, 2012 IL 111443, ¶ 64. Section 10-55(c) of the Administrative Procedure Act is one such exception that allows for the recovery of attorney fees by a party who successfully has an administrative rule invalidated by a court. *Illinois Department of Financial and Professional Regulation v. Rodriguez*, 2012 IL 113706, ¶ 6. Specifically, section 10-55(c) provides:

"In any case in which a party has any administrative rule invalidated by a court for any reason, including but not limited to the agency's exceeding its statutory authority or the agency's failure to follow statutory procedures in the adoption of the rule, the court shall award the party bringing the action the reasonable expenses of the litigation, including reasonable attorney's fees." 5 ILCS 100/10-55(c) (West 2018).

The Administrative Procedure Act itself defines a "rule" as "each agency statement of general applicability that implements, applies, interprets, or prescribes law or policy[.]" 5 ILCS 100/1-70 (West 2018). However, the definition of a rule explicitly does not include "statements concerning only the internal management of an agency and not affecting private rights or procedures available to persons or entities outside the agency[.]" *Id.* The purpose of section 10-55(c) is to "discourage enforcement of invalid rules and give those subject to regulation an incentive to oppose doubtful rules where compliance would otherwise be less costly than litigation." *Citizens Organizing Project v. Department of Natural Resources*, 189 Ill. 2d 593, 598-99 (2000). Like other statutes authorizing the recovery of attorney fees, section 10-55(c) must be strictly construed. *Rodriguez*, 2012 IL 113706, ¶ 13.

¶ 40    Even assuming, *arguendo*, that the notification provision of IDOC's drug testing policy was an "administrative rule" for purposes of section 10-55(c), Hall's argument fails for the simple reason that he has not convinced a court to invalidate any part of the drug testing policy. In fact, Hall has not even asked a court to invalidate a rule. Rather, his argument actually depends on the validity of the testing policy, as he merely contends that IDOC did not follow it in this specific case. Of course, contending that an agency did not follow its own rule is quite a different thing from contending that the agency's rule was not valid in the first place. See *Ecko, Inc. v. Edgar*, 135 Ill. App. 3d 557, 562 (1985) (stating that section 10-55(c) "does not permit recovery simply

because the agency failed to follow its own rule"). Thus, there is no basis upon which to award Hall attorney fees.

¶ 41          C.          Whether the Test was Supported by a Reasonable Suspicion

¶ 42    Finally, we address IDOC's contention that the drug test was supported by a reasonable suspicion, thereby rendering termination the only possible sanction for Hall's refusal to submit. Although no party contests our jurisdiction to consider this argument, we briefly pause to consider the matter of jurisdiction before reaching the merits. See *Xcel Supply LLC v. Horowitz*, 2018 IL App (1st) 162986, ¶ 26 (the appellate court always has an independent duty to consider its own jurisdiction).

¶ 43    Relying on section 3-103 of the Code of Civil Procedure, the circuit court ruled that IDOC's arguments in favor of reasonable suspicion were not properly before the court because IDOC did not file its own complaint or counter-complaint within the statutory time period. Section 3-103 states that "[e]very action to review a final administrative decision shall be commenced by the filing of a complaint and the issuance of summons within 35 days from the date that a copy of the decision sought to be reviewed was served upon the party affected by the decision[.]" 735 ILCS 5/3-103 (West 2018). Because Hall and IDOC raised different challenges to the Commission's decision, the circuit court apparently read section 3-103 to require IDOC to file an independent complaint for administrative review.

¶ 44    However, this court rejected a similar argument in *Illinois Department of Human Services v. Porter*, 396 Ill. 2d 701 (2009). There, the Department of Human Services filed a timely complaint for administrative review of the Commission's decision suspending Porter in lieu of termination. *Porter*, 396 Ill. 2d at 713. Porter answered and counterclaimed that her suspension was unwarranted. *Id.* The circuit ruled that it lacked jurisdiction to consider Porter's arguments

because she did not file a separate complaint or counter-complaint within the statutory 35-day period. *Id.* This court disagreed, finding that the Department of Human Services' timely complaint was all that was required to commence the action for purposes of section 3-103. *Id.* at 716. The court further reasoned that, once the action was commenced in the circuit court, the circuit court gained jurisdiction over all aspects of the Commission's decision. *Id.* (quoting 735 ILCS 5/3-110 (West 2006) (the scope of the administrative review "shall extend to all questions of law and fact presented by the entire record before the court")).

¶ 45   We agree with the reasoning of *Porter*, and therefore find that the circuit court had jurisdiction to consider IDOC's arguments. As the circuit court had jurisdiction over the entire matter, and IDOC filed a timely cross-appeal, there is no obstacle to our jurisdiction. We also note that, in accordance with *Porter*, remand is not required because we review the decision of the Commission, not the circuit court. *Id.* at 718.

¶ 46   Turning to the merits of IDOC's argument, IDOC's drug testing policy allows for an employee to be subject to testing if "there is a reasonable suspicion that the employee is using or is under the influence of drugs." Admin. Dir. 03.02.200(II)(H)(2). According to the policy,

> "Reasonable suspicion exists if specific objective facts and circumstances warrant rational inferences that the employee is using or is under the influence of drugs. Reasonable suspicion may be based upon, among other matters:
>
> a. Observable phenomena, such as direct observation of use or the physical symptoms of using or being under the influence of drugs such as, but not limited to, slurred speech, direct involvement in a serious accident or disorientation.
>
> b. A pattern of abnormal conduct or erratic behavior.

c. Information provided by either reliable and credible sources or that is independently corroborated." Admin. Dir. 03.02.200(II)(H)(1).

Because the existence of reasonable suspicion presents a mixed question of law and fact, we review under the "clearly erroneous" standard. *Wolin v. Department of Financial and Professional Regulation*, 2012 IL App (1st) 112113, ¶ 20. In other words, we afford significant deference to the Commission and reverse only if we are left with the "definite and firm belief that a mistake has been committed." *Id.*

¶ 47    IDOC observes that in the criminal law context, reasonable suspicion is a lesser standard of proof than a preponderance of the evidence or even probable cause. See *People v. Close*, 238 Ill. 2d 497, 511-12 (2010). Referencing the language of the policy, IDOC also argues that Garnett's determination of reasonable suspicion was supported by (1) the "observable phenomen[on]" of the bag in Hall's vehicle, (2) the fact that the bag was discovered after Hall was involved in a "serious accident," and (3) information about the bag and accident from a reliable source, namely the Illinois State Police.

¶ 48    While we agree with IDOC that a reasonable suspicion requires less than a preponderance of the evidence, we cannot say that the Commission's decision was clearly erroneous. First, although the bag was discovered in the wake of a serious accident, there is no indication in the record that drug use was a contributing factor. Indeed, neither Kunken nor Bridell, the only witnesses to observe Hall on the night of the accident, even suspected that Hall was under the influence of marijuana. While it is reasonable to suspect that intoxication was a major factor in the accident, the record shows that the intoxication came from alcohol, not marijuana.

¶ 49    To the extent IDOC relies on the bag itself as an observable fact supporting a reasonable suspicion, we note that the bag was never found to have contained marijuana. Rather, Bridell

merely "assumed" it was marijuana based on its odor and could not test the residue because there was an insufficient amount. No other witness observed the bag firsthand. As a factual matter, the Commission pointedly refrained from determining that the bag contained marijuana on the night of the accident, stating that all that was established was that the bag "may have once held marijuana." As the substance was never tested and no witness even testified that it was marijuana, we cannot say that this determination was against the manifest weight of the evidence.

¶ 50    Finally, although we agree with IDOC's contention that the Illinois State Police are generally a reliable source of information, this analysis is too shallow under the facts of this case. Here, Garnett's information came from a conversation with Delia, who in turn learned about the bag from a conversation with an unknown "commander" in the Illinois State Police. However, this "commander" was never identified, did not testify, and, as far as the record shows, did not observe the bag himself. Moreover, Garnett admittedly did not take any steps to clarify or verify the information he learned fourth-hand. Both of these factors weigh against the reliability of the information. IDOC insists that Garnett did not need to identify Delia's source or verify the information because the totality of the circumstances "suggest that the information that passed between ISP and [IDOC] was reliable." However, elsewhere in its brief IDOC concedes that Garnett did not appear to understand that there was only residue in the bag. The Commission found that this misapprehension undermined the reliability of the information and underscored that it is unclear exactly what information was actually relayed to IDOC from the Illinois State Police. We agree with Commission. Thus, even bearing in mind the relatively low standard required for a reasonable suspicion, we find that the Commission did not clearly err in determining that that standard was not met in this case.

¶ 51                                        III. CONCLUSION

¶ 52    For the reasons stated, the order of the circuit court affirming the Commission's decision is affirmed.

¶ 53    Affirmed.