NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2025 IL App (4th) 231542-U

NO. 4-23-1542

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 13, 2025
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| ROCKFORD PUBLIC SCHOOLS, DISTRICT NO. 205, | ) ) | Review of Order of the Illinois Educational Labor Relations |
| Petitioner, | ) | Board |
| v. | ) | No. 23-RS-0017-C |
| THE ILLINOIS EDUCATIONAL LABOR RELATIONS BOARD, STATE PANEL, and ROCKFORD BUILDING MAINTENANCE ASSOCIATION, IEA-NEA, | ) ) ) ) | |
| Respondents. | ) | |

PRESIDING JUSTICE HARRIS delivered the judgment of the court.
Justices Steigmann and Cavanagh concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The Illinois Educational Labor Relations Board did not err in finding that a group of school district employees had a sufficient community of interest with employees in an existing bargaining unit and that the two groups formed an appropriate bargaining unit.

¶ 2    Petitioner, Rockford Public Schools, District No. 205 (District), seeks administrative review of a decision of the Illinois Educational Labor Relations Board, State Panel (Board), granting a petition filed by the Rockford Building Maintenance Association, IEA-NEA (Union), to add a group of District employees to an existing bargaining unit represented by the Union and certifying the Union's proposed new bargaining unit. The District appeals, arguing the Board erred in finding the proposed bargaining unit was appropriate. We affirm.

¶ 3                         I. BACKGROUND

¶ 4        The District and the Union are parties to a collective bargaining agreement (CBA), effective from July 1, 2022, through June 30, 2026. In December 2022, the Union filed a self-determination majority interest petition with the Board pursuant to section 7(c) of the Illinois Educational Labor Relations Act (Act) (115 ILCS 5/7(c) (West 2022)), alleging that a group of District employees wanted to be added to an existing bargaining unit of District employees that the Union already represented. Specifically, the Union proposed adding the position of "Technology Specialist I"—referred to by the parties as "Field Techs"—to a bargaining unit with the following composition, as agreed by the parties:

> "All full-time non-certified educational employees in the categories of Building Engineers, Custodians, Assistant Building Engineers, Program Supervisors, Driver Trainers, Dispatchers, Field Supervisors, Steamfitters, [Heating, Ventilation, and Air Conditioning (HVAC)] Technicians, Stockroom Employees, Truck Drivers, Truck Helpers, Printers, Painters, Electricians, Plumbers, Carpenters, Locksmiths, Environmental Technicians, Low Voltage Electricians, Site Maintenance Employees, Mechanics, Generator Mechanics, Body Shop Technicians, Bus Maintenance Specialists, State Inspection/Bus Wash Employees, Preparation Specialists, Relief Personnel, Small Motor Repairment[,] and Transportation Parts Persons employed by [the District]."

¶ 5        In January 2023, the District filed a response, opposing the Union's petition. It argued the Union's proposed bargaining unit was "not appropriate" because there was "no historical pattern of recognition between the original unit and the proposed additional position." The District also asserted there was "no community of interest" between the two groups due to Field Techs and bargaining unit members having different duties, departments and supervision,

educational requirements, and pay. Alternatively, the District argued that if Field Techs were included in the existing bargaining unit, the unit would only be appropriate if "all equivalent technology support-related positions" were also included.

¶ 6    In May 2023, a hearing on the Union's petition was conducted before an Administrative Law Judge (ALJ). The Union presented testimony from two witnesses: (1) Scott Phelps, its president and a distribution foreperson for the District, and (2) Logan Sprecher, a District employee in the Field Tech position. The District presented testimony from several witnesses: (1) Matthew Zediker, its chief human resources officer; (2) Jason Barthel, its chief information officer; (3) Andrew Lippert, its director of technology services; (4) Christopher Gulley, a Field Tech; (5) Andrew Flowers, a help desk specialist; and (6) Michael Phillips, its chief operating officer. The parties submitted exhibits, which included job descriptions of the relevant positions. Their prehearing filings also included a joint statement of uncontested facts.

¶ 7    Evidence showed the District was comprised of over 40 buildings, including school buildings, an administration building, an Operations Support Center, and a transportation building. Under the District's organizational structure, all District employees were under the authority of the superintendent. The superintendent directly oversaw several cabinet member positions, including a chief operating officer and a chief information officer. In turn, each cabinet member oversaw various departments, and each department also had its own supervisors. Bargaining unit positions fell within the facilities, logistics and support services (also referred to as distribution), and transportation departments, which all reported to the District's chief operating officer. Field Techs fell within the technology services department, which reported to the District's chief information officer.

¶ 8    Zediker, the District's chief human resources officer, estimated that 90 District

employees were current bargaining unit members represented by the Union. He testified that the vast majority of the bargaining unit positions were funded out of "Fund 10 or local dollars." Evidence showed that bargaining unit positions in the District's facilities department were responsible for maintaining the District's heating, cooling, plumbing, electrical, and communication systems. Some of these positions were also responsible for maintaining the interiors and exteriors of the District's buildings. Bargaining unit employees in the District's transportation department maintained and oversaw the use of the District's buses and other vehicles. Finally, bargaining unit employees in the District's logistics and support services department were responsible for organizing, transporting, and unloading supplies, equipment, and other materials within the District.

¶ 9        The education and experience required of bargaining unit positions varied. Union President Phelps testified some unit members were required to hold skill-based licenses or industry certifications. For example, he noted that there were bargaining unit members who held commercial driver's licenses, were licensed electricians, or were certified HVAC technicians. The District's job description for "HVAC Technicians/Electrician" indicated it preferred that such employees have an associate's degree in electronics. The District also preferred apprenticeship experience for some bargaining unit positions. Many positions required that employees have a high school diploma or a GED, along with practical experience. Other positions, specifically those within the District's print shop, had no specific licensing, educational, or experience-related requirements.

¶ 10        Phelps further testified that most bargaining unit members worked a 12-month schedule, with only "a very small amount" working 10 months out of the year. The wage schedule for bargaining unit employees was from $15.53 per hour to $32.70 per hour. According to Phelps,

bargaining unit members worked out of the District's Operations Support Center and transportation building. He agreed that Union members had a "home building" and that their work duties would also "take them to various buildings in the District." Phillips, the District's chief operating officer, testified that employees in the District's facilities department worked from either 5 a.m. to 1:30 p.m. or 6 a.m. to 2:30 p.m., stating that an early start allowed the employees "to get into classrooms, school buildings, [and] offices prior to normal business hours to get work orders accomplished." He also stated that mechanics in the District's transportation department had two shifts, with some employees starting work at 5 a.m. and some starting at 11 or 11:30 a.m. Finally, the work hours for employees in the logistics and support services department were typically 7 a.m. to 3:30 p.m.

¶ 11            Facilities department employees received work assignments through a work order system called "SchoolDude." Any District employee could submit a work order through that system. Chief Operating Officer Phillips testified that for employees in the District's facilities department, work orders were received by the senior manager, who would assign it to "the proper foreman." The foreman would then assign the work order to a member of their staff. Phillips testified staff had "discretion to work through their work orders" with respect to "lower priority items." Union President Phelps testified that distribution employees received work through "a truck order form." Additionally, according to Phillips, the District's transportation department used a system called "FleetSoft" to track its work, and a paper form was used to request work from "print services" employees.

¶ 12            Evidence showed Field Techs were responsible for providing technology support to District employees, including "installation, maintenance, and troubleshooting of District-owned mobile devices, laptops, computers, Chromebooks, iPads, peripherals, interactive flat panels,

document cameras[,] and software." They were required to have a high school diploma or GED. Preferred qualifications for the position also included an associate's degree, two to three years of technology experience, and "CompTIA A+ certification." Field Techs worked for 12 months of the year and from 7:30 a.m. to 4 p.m. each workday. They had a pay range of between $16.58 to $24.87 per hour and received the same health benefit options as all other District employees, including bargaining unit members. Barthel, the District's chief information officer, testified the funding source for the District's information technology (IT) department, including for Field Techs, was "based out of Fund 10, which is the general fund."

¶ 13        In performing their job duties, Field Techs worked out of the District's administration building and had an assigned "zone of responsibility." Sprecher, the Field Tech who testified for the Union, identified the administration building as his "home base" but asserted that most of his duties took place in the school buildings to which he was assigned. Approximately 80% of Field Techs' work was "in the field." Sprecher stated his work at the administration building included processing incoming and outgoing Chromebooks that needed to be repaired. He testified Field Techs did not transport the Chromebooks themselves and, instead, utilized the District's distribution team.

¶ 14        According to Sprecher, Field Techs primarily received work through a "ticketing system" that was specific to the District's IT department and different from the system used by bargaining unit members. He stated he prioritized his work tasks himself. Evidence also indicated that the "tickets" Field Techs received were classified as high, medium, and low priority. Chief Information Officer Barthel testified as follows:

"The tickets have a priorities [*sic*] set on them and it would be really prioritized by high, medium and low priority. High priority would be something that would be

- 6 -

service impacting, such as the classroom cannot function, so a critical issue where it can't function.

A medium or low priority might be something that a teacher has an issue going on, but I can continue to teach or do what I have to in my classroom."

Barthel asserted that outside of the ticketing system assigning priority, Field Techs had the independent discretion to rank which job to do first and that they could also adjust priorities based on their own previous experience.

¶ 15    Union President Phelps testified that the Union's petition was supported by a majority of the District's Field Tech employees. Evidence showed there were 10 Field Tech positions, 9 of which were filled at the time of the hearing. Of those nine employees, eight supported the Union's petition. The Field Tech position had never been recognized as a part of the bargaining unit at issue or any other bargaining unit that represented District employees. Sprecher testified he supported Field Techs joining the Union's bargaining unit, as he was concerned about the terms and conditions of his employment. Phelps believed Field Techs should be included within the existing bargaining unit because they acted "like one of the trades" and "service[d]" the District's buildings.

¶ 16    Evidence showed that the jobs and duties of bargaining unit members were not interchangeable with one another or Field Tech employees. However, Union President Phelps testified the various positions did "interact" with one another. He stated, for example, that distribution employees interacted with everyone because they delivered to everyone in the District. Phelps provided another example regarding the "team effort" of installing classroom smartboards, which he described as "large TV monitor[s]," testifying as follows:

"If we get these 75-inch smartboards in, distribution has to deliver it. The

electricians then have to put in the outlet for the smartboard. The carpenters have to install the bracket for the smartboard. Then you have low-voltage [electricians] come in there to run wire to the smartboard.

So, in that, just that one job a lot of us are interacting."

Phelps testified that a Field Tech would fit into the continuum of smartboard installation by being "there to assist, sometimes, the low-level electricians." Field Techs also hooked up the Internet and would troubleshoot any problems. Phelps testified that he had no role in installing smartboards but that he had personally been involved with delivering them. He stated that such delivery requests "usually" came from the IT department. Phelps recalled receiving a smartboard delivery request directly from a Field Tech, although he did not know when that occurred.

¶ 17    Regarding the installation of smartboards or "smart TVs," the following colloquy occurred between the District's counsel and Field Tech Sprecher:

"Q. Your typical day doesn't involve installation of smart TVs; is that correct?

A. Not typically, no. Most are already installed and, until we have more to replace; I know a lot of them are going out at this point, it's not an uncommon occurrence for us to deal with them.

Q. And you said a number of them are installed, so your [*sic*] supporting the TVs that are already installed would be similar to this other troubleshooting of peripheral devices, correct?

A. Yes."

Sprecher testified that when performing his work as a Field Tech, the individuals or "end-users" he dealt with the most were teachers or school staff members. He did not interact a lot with

bargaining unit members unless he was "going onsite" to the Operations Support Center or the transportation building and assisting them as an "end-user."

¶ 18        Chief Information Officer Barthel testified there was "no direct interaction" between Field Techs and bargaining unit members. He explained as follows:

"The [Union] members, as an example, *** low-voltage techs will install the wiring *** placed on the wall, the network cabling to the IT closet where it resides.

And, again, there's no handoff of work, but once that installation is complete by the low-voltage techs[,] *** the [Field Techs] will connect the equipment into the end-user through the data plate that was set up or installed by the low-voltage tech, and they will also plug it in from the panel inside the closet into our *** immediate IT security network infrastructure into the switch to provide network connectivity."

Barthel testified that in such instances, Field Techs would learn about the work they needed to complete through a "ticket" from an end-user or information disseminated from a supervisor or director. Barthel asserted Field Techs interacted the most with members of the teachers' union, stating, "[T]hat's where they have the most end-users."

¶ 19        Gulley, the Field Tech who testified as a witness for the District, stated his job duties included helping end-users solve IT-related issues. When asked whether he interacted with bargaining unit members, such as low-voltage electricians, when performing his work, Gulley stated he had "spoken to one in passing," but that he had not "worked on any projects [with such individuals] or anything." Gulley testified that while he was "out in the field," he had interactions with teachers and office professionals. He identified teachers and office professionals as the individuals who made the most "ticket requests" for Field Techs. Gulley also denied that there was

"any real hand-off" of work between him and bargaining unit employees.

¶ 20    In August 2023, the ALJ issued his recommended decision and order, as well as a corrected recommended decision and order, addressing two errors in his original decision that are not relevant to the issues raised on appeal. The ALJ recommended "finding that the petitioned-for unit contain[ed] a sufficient community of interest to constitute an appropriate unit under the Act" and granting the Union's petition. Initially, he rejected the District's argument that Field Techs should not be included within the existing bargaining unit because they had different job duties, had separate workplaces, were part of a different department, and had separate supervision from current bargaining unit members. The ALJ noted the unit at issue was comprised of employees from several different District departments with separate direct supervisors, and he characterized differences with respect to how Field Techs carried out their work as "minor distinctions," stating as follows:

> "As with many positions already contained within the Union, the Field Tech performs much of their work out among the various buildings within the District. While they have discretion to prioritize the work assigned to them, they are assigned work through a ticketing system designed for the purpose of assigning that work, in much the same way that *** mechanics, electrical workers, and plumbers, among others, receive requests for work."

¶ 21    The ALJ also found that Field Techs had a similar level of functional and social contact as the existing bargaining unit, in that Field Techs submitted work requests from bargaining unit employees, "cooperate[d]" with bargaining unit employees with the installation of smartboards and other technological equipment, and could be called upon to provide technology support services to bargaining unit members. The ALJ acknowledged that although there was no

interchangeability between Field Techs and bargaining unit members, there was "also no level of interchangeability between members of the current unit."

¶ 22 The ALJ next rejected arguments from the District that the Field Tech position had very different pay, benefits, and educational requirements than bargaining unit positions. He found "no practical difference between the requirements for a Field Tech and those of many bargaining unit positions" existed, that the pay range for Field Techs fell "within the scale established by the CBA for unit members," and that all District employees had access to the same health insurance programs. The ALJ further pointed out that like Field Techs, most bargaining unit members worked a 12-month schedule and that many bargaining unit positions had similar hours to the Field Tech position.

¶ 23 Finally, the ALJ found a "significant factor" in favor of the Union's petition was that it was supported by a majority of Field Tech employees, who "appear[ed] to very much desire to be in the bargaining unit." The ALJ noted that eight out of the nine Field Techs employed by the District supported the Union's petition.

¶ 24 The District filed exceptions to the ALJ's recommended decision and order, asking the Board to reconsider and reject the ALJ's decision and "reject the expanded unit sought in the [Union's] petition." The District specifically argued the ALJ (1) improperly placed the burden on it to propose an alternative to adding Field Techs to the existing bargaining unit, (2) misconstrued its argument relative to a particular case that it cited, (3) reached legal conclusions that were contradicted by his factual findings and improperly focused on diversity in the existing bargaining unit, (4) failed to properly analyze its argument regarding whether adding Field Techs to the bargaining unit would require the inclusion of additional technology-related positions, *i.e.*, help desk specialist positions, and (5) incorrectly identified one of its witnesses as testifying on behalf

of the Union.

¶ 25　　　　In November 2023, the Board issued its opinion and order. It adopted the facts set forth by the ALJ and affirmed his corrected recommended decision and order with one modification. Specifically, the Board corrected the ALJ's statement that one of the District's witnesses, Zediker, had also testified on behalf of the Union. Relevant to this appeal, the Board rejected the District's argument that the ALJ reached legal conclusions that were contradicted by his factual findings and that "the ALJ gave improper weight to a few minor similarities." In so holding, the Board found that Field Techs and current bargaining unit members had common wages and access to the same health insurance programs. It noted that like most bargaining unit members, Field Techs worked 12 months per year and that "the desires of the employees favor[ed] inclusion in the petitioned-for unit." The Board also stated as follows:

> "There is a high degree of contact between Field Techs and many members of the existing unit, as both groups perform much of their work out among the various buildings within the District. Additionally, Field Techs work closely with members of the existing unit when they install smartboards and other technological equipment."

¶ 26　　　　The Board further noted differences between the two groups, including that there was a lack of interchangeability in the job functions of Field Techs and current bargaining unit members, as well as no common supervisor between the two groups. Ultimately, however, like the ALJ, the Board found the differences between the groups were "less important when viewed in the context of the existing unit's diversity." In particular, it found "existing bargaining unit members [were] not interchangeable as a whole due to the diversity of the positions contained therein" and that "members of the bargaining unit do not all share a common supervisor." The Board concluded

that "[a]dding the Field Techs to the existing unit would not increase the diversity of interest among [bargaining unit] employees."

¶ 27        In December 2023, the Board entered an order adding the District's Field Tech employees to the bargaining unit and certifying the Union as their exclusive bargaining representative.

¶ 28        This appeal followed.

¶ 29                                    II. ANALYSIS

¶ 30        On appeal, the District argues the Board clearly erred in determining that Field Techs and existing bargaining unit members shared a "community of interest" and that they could form an appropriate bargaining unit. Specifically, it argues the Board (1) relied on factual findings regarding Field Techs' interactions with bargaining unit employees that were against the manifest weight of the evidence and (2) improperly discounted evidence of significant differences between Field Techs and existing bargaining unit members because of differences within the existing bargaining unit.

¶ 31        The Board's bargaining unit determinations are subject to judicial review in accordance with the Administrative Review Law (735 ILCS 5/3-101 through 3-113 (West 2022)). See 115 ILCS 5/7(d) (West 2022). Administrative review of the Board's decision "extends to all questions of law and fact presented by the record." *Western Illinois University v. Illinois Educational Labor Relations Board*, 2021 IL 126082, ¶ 30 (citing 735 ILCS 5/3-110 (West 2016)). "The proper standard of review in cases involving administrative review depends upon whether the question presented is one of fact, one of law, or a mixed question of fact and law." *Beggs v. Board of Education of Murphysboro Community Unit School District No. 186*, 2016 IL 120236, ¶ 50.

¶ 32        "An agency's findings of fact will be deemed *prima facie* true and correct unless they are against the manifest weight of evidence." *Western Illinois University*, 2021 IL 126082, ¶ 30. "Factual determinations are against the manifest weight of the evidence if the opposite conclusion is clearly evident." *Beggs*, 2016 IL 120236, ¶ 50. "An agency's findings on questions of law are reviewed *de novo*." *Western Illinois University*, 2021 IL 126082, ¶ 30. Finally, "[a] mixed question of law and fact is reviewed for clear error." *Id.* "A mixed question of law and fact asks the legal effect of a given set of facts." *Board of Education of City of Chicago v. Illinois Educational Labor Relations Board*, 2015 IL 118043, ¶ 16. In resolving such questions, "a reviewing court must determine whether established facts satisfy applicable legal rules." *Id.* An agency's decision on a mixed question of law and fact "is 'clearly erroneous' when the reviewing court is left with the definite and firm conviction that a mistake has been committed." *Id.* The clearly erroneous standard is highly deferential but "does not relegate judicial review to mere blind deference of an agency's order." (Internal quotation marks omitted.) *Western Illinois University*, 2021 IL 126082, ¶ 70.

¶ 33        Pursuant to section 7 of the Act, "[t]he Board is empowered to administer the recognition of bargaining representatives of employees of public school districts *** making certain that each bargaining unit contains employees with an identifiable community of interest." 115 ILCS 5/7 (West 2022). Under section 7(a), the Board determines the appropriateness of a unit on a case-by-case basis. *Id.* § 7(a). Specifically, the Act provides as follows:

> "In determining the appropriateness of a unit, the Board shall decide in each case, in order to ensure employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purpose of collective bargaining, based upon but not limited to such factors as historical pattern of recognition, community

of interest, including employee skills and functions, degree of functional integration, interchangeability and contact among employees, common supervision, wages, hours and other working conditions of the employees involved, and the desires of the employees." *Id.*

¶ 34 "Section 7(a) requires only that the bargaining unit be appropriate and does not require a petitioned-for unit be the most appropriate unit." *Board of Trustees of University of Illinois v. Illinois Educational Labor Relations Board*, 2015 IL App (4th) 140557, ¶ 40. "A proposed unit should be certified if it meets the applicable standards in the *** Act, even though a separate unit of classified employees would also be an appropriate unit." (Internal quotation marks omitted.) *Id.* "However, a bargaining unit will not be appropriate if, under all of the circumstances, it is artificial or arbitrary." (Internal quotation marks omitted.) *Id.* Further, "it is a misinterpretation of the Act to focus on one or two factors to the exclusion of the others." *Community College District No. 509 (Elgin Community College) v. Illinois Educational Labor Relations Board*, 277 Ill. App. 3d 114, 122 (1996).

¶ 35 Initially, the District argues the Board's factual findings were against the manifest weight of the evidence. Specifically, it challenges the Board's statements that (1) there was a "high degree of contact between Field Techs and many members of the existing unit, as both groups perform much of their work out among the various buildings" and (2) "Field Techs work[ed] closely with members of the existing unit when they install smartboards and other technological equipment." The District argues the evidence, instead, showed precisely the opposite, that Field Techs had only minimal contact or engagement with bargaining unit members, such that the factor of "contact among employees" (115 ILCS 5/7(a) (West 2022)) weighs against finding a community of interest between the two groups.

¶ 36    In response, the Board and the Union suggest that the District has interpreted the Board's findings too narrowly. They argue the record supports the Board's challenged statements through evidence that Field Techs and existing bargaining unit members interacted both by serving each other and working together to install and connect technological equipment for other District staff.

¶ 37    As noted above, section 7(a) sets forth several community of interest factors for consideration when determining the appropriateness of a proposed bargaining unit, including the "degree of functional integration" and "interchangeability and contact among employees." *Id.* The Board's challenged comments suggest that it found such factors supported finding a community of interest between Field Techs and existing bargaining unit members. We cannot say that opposite conclusions from the ones reached by the Board are clearly evident.

¶ 38    Notably, as the Board found, evidence showed that both Field Techs and existing bargaining unit members performed "their work out among the various buildings within the District." Union President Phelps testified Union members had a "home building" and that their duties would "take them to various buildings in the District." Field Techs similarly had a "home base," the District's administration building, and performed their work in other District buildings to which they were assigned. Evidence also showed Field Techs requested work from bargaining unit members. Phelps, who worked for the District as a distribution foreman, testified the District's IT department made requests for the transportation of Smartboards and that he had received requests before from Field Techs. Field Tech Sprecher testified that he made distribution requests in connection with the transportation of Chromebooks. Field Techs also provided technology support services for unit members. In particular, Sprecher testified he provided support to both the Operations Support Center and the transportation building, which were the "home buildings" of

bargaining unit members.

¶ 39 Further, evidence supported a finding that the work performed by Field Techs was in some ways complementary to or reliant upon the work performed by bargaining unit members. For example, electricians, low-voltage technicians, carpenters, distribution employees, and Field Techs all had a role with respect to the installation of classroom Smartboards. Barthel, the District's chief information officer, also testified that while low-voltage technicians did not have direct interaction with Field Techs, they did install wiring and network cabling to IT closets. He stated that once work was completed by the low-voltage technicians, Field Techs would "connect the equipment into the end-user through the data plate that was set up or installed by the low-voltage tech."

¶ 40 Here, although the evidence does not establish a high level of direct, in-person interaction between Field Techs and existing bargaining unit members, it does show contact and integration of their job functions. As argued by the Union, both groups provided "non-instructional support functions out among the various buildings in the District to support classroom instruction and District functions." Further, even counting the "degree of functional integration" and "contact among employees" factors as weighing against finding a community of interest between Field Techs and existing unit members, the Board properly identified several other factors that weighed in favor of such a finding. In particular, the two groups have common wages, with Field Techs having a wage range of between $16.58 to $24.87 per hour and bargaining unit members having a wage range of $15.53 to $32.70 per hour. Both groups had access to the same health-insurance programs and, like Field Techs, most bargaining unit members worked 12 months a year. Significantly, a majority of Field Techs, eight out of nine employees, favored representation by the Union. See *Black Hawk College Professional Technical Unit v. Illinois Educational Labor*

- 17 -

*Relations Board*, 275 Ill. App. 3d 189, 198-99 (1995) ("The desires of the employees is an important consideration because the goal in determining the appropriateness of a bargaining unit is to ensure employees the fullest freedom in exercising the rights guaranteed by the Act for the purpose of collective bargaining.").

¶ 41 The record further shows that the Board considered differences between Field Techs and existing bargaining unit members. Specifically, it noted no evidence of interchangeability between the two groups and the lack of a common supervisor. However, regarding those factors, the Board also stated as follows:

> "While there are similarities between these two groups, there are also differences. But these differences are less important when viewed in the context of the existing unit's diversity. Adding the Field Techs to the existing unit would not increase the diversity of interest among these employees."

¶ 42 The District challenges the Board's conclusion, arguing it improperly "discounted" or removed from consideration the above differences, which indisputably weighed against finding a community of interest between the groups at issue. According to the District, there was no question of representation for the existing unit and the similarities or differences among existing bargaining unit employees were irrelevant to the determination of whether Field Techs should be added to the bargaining unit.

¶ 43 The District cites *Sedol Teachers Union v. Illinois Educational Labor Relations Board*, 276 Ill. App. 3d 872, 881 (1995), for the proposition that when there has been a self-determination petition to add employees into an existing unit, "there is no question of representation in the existing unit" and, instead, "only a question of representation among the employees sought to be added." In that case, the Board reversed an ALJ's grant of a unit

clarification petition filed by the union, finding such a petition "was not a proper method through which to add historically excluded positions to an existing unit." *Id.* at 877-78. On review, the First District affirmed the Board's decision, explaining that a self-determination petition, rather than a unit clarification petition, was the appropriate method for adding employees to an existing unit. *Id.* at 881. The reviewing court did not address the proper factors for consideration when the Board is determining unit appropriateness or considering relevant community of interest factors. Accordingly, *Sedol* does not support finding error by the Board in the present case.

¶ 44    As indicated above, section 7(a) of the Act requires the Board to make its determination of unit appropriateness "on a case-by-case basis." *Board of Trustees*, 2015 IL App (4th) 140557, ¶ 41. It sets forth a nonexhaustive list of factors for consideration. 115 ILCS 5/7(a) (West 2022). Additionally, one or two factors should not be solely focused upon to the exclusion of all others. *Community College District No. 509*, 277 Ill. App. 3d at 122.

¶ 45    Here, the Board's decision does not reflect that it improperly discounted or removed relevant factors from consideration. Rather, it demonstrates how the Board weighed the relevant factors that it did consider. Specifically, the Board determined that the factors of "interchangeability" and "common supervision"—which supported finding differences between Field Techs and existing bargaining unit members—were entitled to *less weight*, given the diversity that was already present within the existing bargaining unit. Although the Board did not cite any authority for its consideration of the existing unit's diversity, its findings were similar to those set forth by the ALJ, who cited the Board's decision in *Thornton Township High School District No. 205*, 2 PERI ¶ 1103 (IELRB 1986), and found the section 7(a) factors "should be considered in the light of all surrounding circumstances." Relevant to this issue, in *Thorton*, the Board stated as follows: " 'Community of interest' and unit appropriateness are not absolutes.

- 19 -

They are relative to the total context in which they are being considered and must be viewed in light of all of the surrounding circumstances, including all existing unit configurations and the employer's unrepresented employee groups." *Id.*

¶ 46 Here, the Board's finding of diversity within the existing bargaining unit was supported by the evidence. The record shows the existing bargaining unit was made up of employees with numerous distinct job classifications from three different departments with varying direct supervisors. The work duties between the various job classifications were not interchangeable. The Board concluded that "[a]dding the Field Techs to the existing unit would not increase the diversity of interest among [bargaining unit] employees." Thus, although the Board recognized the differences that existed between Field Techs and existing bargaining unit members, it determined those differences were not significant, given the circumstances of the existing unit and its diversity. We find no error in the Board's consideration of the makeup of the existing bargaining unit, specifically, the similarities and differences between existing unit members, when determining whether the bargaining unit proposed by the Union was appropriate.

¶ 47 On review, the District additionally contends the Board failed to address other factors and evidence that weighed against finding a community of interest between Field Techs and existing bargaining unit members, including differences in hiring requirements and working conditions. Although such evidence was not explicitly referenced by the Board, it was addressed by the ALJ, whose decision the Board affirmed.

¶ 48 Regarding hiring requirements, the ALJ found as follows:

"[The District] argues that *** many union positions are trades, which have their own educational and apprenticeship requirements. However, many positions in the unit are not trades. Several unit positions also prefer applicants with an Associate's

- 20 -

Degree. Most require some level of experience. Others require a professional certification, while others require an apprenticeship or other proof of the required expertise. The District's requirements for Field Techs are a high school diploma or G.E.D., plus some experience in the field, with a preference for an Associate's Degree and CompTIA A+ certification. *There is no practical difference*." (Emphasis added.).

The ALJ's findings are supported by the record, which showed varied hiring requirements for bargaining unit positions. Some such requirements were not unlike those pertaining to Field Techs. Ultimately, the record reflects no significant difference between the hiring requirements of the two groups such that reversal of the Board's decision is warranted based upon this factor.

¶ 49        Regarding working conditions, the District argues that bargaining unit members perform tasks assigned to them and prioritized by a foreperson and that many start their shifts early, before the start of the school day. It asserts that, by contrast, Field Techs mostly work autonomously, prioritize their own daily tasks, and have hours that align with the school day. In addressing these considerations, the ALJ characterized the differences between Field Techs and bargaining unit members as being only "minor." He noted that both groups performed much of their work out among the various buildings in the District. The ALJ stated Field Techs were "assigned work through a ticketing system designed for the purpose of assigning that work" and that the process was similar to the way bargaining unit members received requests for work. Again, these findings are supported by the record.

¶ 50        Additionally, we note that although Field Techs had some discretion with respect to how they prioritized their work, the evidence indicated their discretion was not unlimited, as the "tickets" they received were also already classified as high, medium, and low priority. Further,

testimony from Chief Operating Officer Phillips indicated some bargaining unit members could also exercise discretion in prioritizing their work. Specifically, he stated that bargaining unit members in the District's facilities department had "discretion to work through their work orders" with respect to "lower priority items."

¶ 51 Finally, with respect to hours of employment, the evidence showed Field Techs worked from 7:30 a.m. to 4 p.m., which aligned with the school day. The work hours of bargaining unit members varied but were not totally dissimilar to the hours worked by Field Techs. In particular, the evidence showed employees in the District's facilities department worked either 5 a.m. to 1:30 p.m. or 6 a.m. to 2:30 p.m., while logistics and support services employees worked 7 a.m. to 3:30 p.m. Again, the record does not reflect significant differences in the working conditions of the two groups at issue.

¶ 52 In this case, the record shows the Board considered the factors set forth in section 7(a) of the Act when affirming the ALJ's decision and determining that the unit proposed by the Union was appropriate. We find the record contains support for the Board's decision and have no "definite and firm conviction that a mistake has been committed." *Board of Education of City of Chicago*, 2015 IL 118043, ¶ 16. Accordingly, contrary to the District's arguments on appeal, the Board did not clearly err in finding that Field Techs shared a community of interest with existing bargaining unit members and that the groups could form an appropriate bargaining unit.

¶ 53 III. CONCLUSION

¶ 54 For the reasons stated, we affirm the Board's judgment.

¶ 55 Affirmed.